STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. J. MINOR SULLIVAN, III, DEFENDANT-APPELLANT.

Argued January 28, 1957—Decided April 1, 1957.

22

*Mr. Harold H. Fisher* argued the cause for appellant (*Messrs. Shanley & Fisher,* attorneys).

*Mr. Frank H. Lawton,* First Assistant Prosecutor, argued the cause for the State (*Mr. Mario H. Volpe,* Mercer County Prosecutor).

The opinion of the court was delivered by
WACHENFELD, J.   The legality of a conviction for perjury is challenged on this appeal by Dr. J. Minor Sullivan, III, defendant-appellant, hereinafter referred to as the defendant.

In 1948 William Horner and his reputed wife owned and operated a second-hand furniture store in Trenton.   On the morning of January 27 he was brutally beaten to death with a blunt instrument and she was seriously injured by a vicious assault.

It is wholly unnecessary to relate in detail the subsequent factual developments except to say that by reason of diligent police investigation six suspects were soon apprehended and taken into custody.

Dr. Sullivan is a general medical practitioner residing in Trenton.   He was asked by the Trenton police to witness the signing of confessions by five of the six men charged with murder.   After his arrival at police headquarters defendant generally interrogated each suspect in what has since become known in legal annals as the "Trenton Six" case.   His

principal inquiries concerned the treatment they had received while in the custody of the police.

A Dr. George Corio was also summoned to act as an impartial witness. Both doctors gave a brief but fairly thorough physical examination to each of the accused. None of the murder defendants indicated he had been maltreated in any fashion and the doctors found no evidence of physical abuse.

Thereafter, Sullivan was queried by the police as to his findings and conclusions, and the questions and answers were recorded in a notarized statement signed by him.

In June of 1948 the murder indictment was brought to trial. It was a long, complicated and difficult case lasting 44 days, and during the course of it Sullivan was called upon to testify on two occasions. He first appeared at a preliminary hearing before the trial judge on the admissibility of the confessions, and later he again testified before the jury as the trial proceeded. All five confessions whose signing Sullivan had witnessed were admitted into evidence, and the six murder defendants were convicted by a jury and subsequently sentenced to death.

The judgment so rendered was reversed by this court, *State v. Cooper,* 2 *N. J.* 540 (1949), on several grounds, including the failure of the jury verdict of guilty to designate the degree of murder in accordance with statutory requirements, and we returned the case for a new trial. To guide the lower court at the second trial, we discussed the admissibility of the aforementioned confessions and cautioned that "[i]n the enforcement of the constitutional guaranty of due process, the inquiry is whether there has been observance of 'that fundamental fairness essential to the very concept of justice. * * *' " and that "a confession induced by physical or moral compulsion, whatever its nature, has no evidential efficacy." Contrary to Sullivan's present contentions, we did not determine that *in fact* the subject confessions had been obtained without due process.

As a result of this reversal, a second murder trial ensued. Sullivan again testified at the preliminary inquiry as to

the admissibility of the confessions and also before the jury itself.

Although Sullivan's testimony grew increasingly unfavorable to the State, the prosecution made no attempt to discard him as a witness until well along in the cross-examination before the jury, when it attempted to plead surprise and thereafter endeavored to neutralize his testimony.

The second trial resulted in the acquittal of four defendants; the remaining two, Collis English and Ralph Cooper, were found guilty of murder in the first degree with a recommendation by the jury of life imprisonment.

We again reversed for numerous trial errors, recited in the opinion in *State v. Cooper*, 10 *N. J.* 532 (1952). The later developments and ultimate disposition of the "Trenton Six" case are not material and have no bearing upon the issues presented by this appeal.

After the second murder trial, two indictments were returned against the defendant. They are essentially the same except that one charges perjury, the other the crime of false swearing. The State's theory is that after the first trial Sullivan directed himself toward securing freedom for the murder defendants and to this end willfully falsified his testimony at the second trial in attempting to establish that the defendants were incompetent at the time they had executed their respective confessions. It is said the testimony of Dr. Sullivan at the first trial was true but that he perjured himself, in the manner indicated in the indictments, at the second trial.

Each indictment contains eight counts reciting verbatim portions of the defendant's testimony at the second murder trial of Ralph Cooper, Collis English, McKinley Forrest, John MacKenzie, James H. Thorpe and Horace Wilson regarding his examinations and observations of these defendants and his conclusions as to their mental and physical condition and the cause thereof.

The perjury indictment alleges that Sullivan "then and there did commit willful and corrupt perjury in manner and form aforesaid, contrary to the provisions of *R. S.*

2 :157–1, and against the peace of this State and the government and dignity of the same."

By court order, the indictments were consolidated and tried together. *R. R.* 3 :5–6.

The perjury indictment was attacked by the defendant, who alleged it was predicated upon expressions of professional opinion and belief and failed to contain allegations necessary for charging a crime and was invalid for this and other reasons. The indictment was sustained in 25 *N. J. Super.* 484 (*App. Div.* 1953), certification denied 13 *N. J.* 289 (1953), *certiorari* denied 347 *U. S.* 903, 74 *S. Ct.* 428, 98 *L. Ed.* 1063 (1954).

The false swearing indictment was likewise subjected to appellate treatment, 33 *N. J. Super.* 138 (*App. Div.* 1954).

To prove the charges made in the indictments, the State introduced transcripts of defendant's testimony at the first and second murder trials. It put upon the stand Dr. Corio and various police officials who were present at the time Sullivan conducted his physical examinations, and produced the question-and-answer statement signed by the defendant in 1948.

The defense was a complete denial and the defendant testified at length. He was supported by character witnesses who testified as to his good repute for honesty and veracity.

By agreement, the case was tried without a jury, and at the conclusion of all of the testimony Judge Morris, who presided, made general and special findings convicting the defendant on seven of the eight counts in the perjury indictment.

The record indicates the State moved for sentence only on the perjury indictment and that no further action was taken upon the false swearing indictment. The latter was apparently disposed of by the trial judge in his remark that the findings made on the perjury indictment were also dispositive of the false swearing indictment. In any event, the indictment charging false swearing is not at issue before us.

The defendant was sentenced to two years on probation and fined $1,500.

The defendant urges the findings of the court and the judgment of conviction are contrary to the weight of the evidence and are the result of passion, prejudice and mistake engendered by inflammatory matter, and that not only did the State fail to prove Dr. Sullivan corruptly and willfully testified to opinions which he did not hold, but further, the State failed to prove by reliable and competent evidence that the opinions expressed were in fact untrue or invalid.

Perjury was defined by early common law "* * * as the willful assertion as to a matter of fact, opinion, belief, or knowledge made by a witness in a judicial proceeding as part of his evidence, either upon oath or in any form allowed by law to be substituted for an oath, whether in open court, in an affidavit, or otherwise, such assertion being known to such witness to be false, and being intended by him to mislead the court, jury, or person holding the proceeding." 41 *Am. Jur., Perjury,* § 2, *p.* 4.

The offense is now controlled by statute in most jurisdictions, but although these vary to some degree in language, basically there is little difference from the common law conception. In general, the state legislatures have defined perjury as willful and corrupt false swearing or affirming, under an oath lawfully administered in the course of a judicial or *quasi*-judicial proceeding, to some matter material to the issue. *State v. Sullivan,* 25 *N. J. Super.* 484 (*App. Div.* 1953), citing 41 *Am. Jur., supra,* § 2, *p.* 4. See *N. J. S.* 2*A*:131–1 *et seq.,* formerly *R. S.* 2:157–1 *et seq.*

As was determined in *State v. Sullivan, supra,* there is a distinction between an honest but erroneous statement of opinion and a false declaration of fact. The latter is held to be a matter of perjury. 41 *Am. Jur., supra,* § 6, *p.* 6; 70 *C. J. S., Perjury,* § 5, *p.* 462.

Similarly, however, where the existence or nonexistence of an opinion or belief is in itself a material matter of fact, a false statement as to such may constitute the offense. 41 *Am. Jur., supra,* § 6, *p.* 6; 70 *C. J. S., supra,* § 5, *p.* 462.

The defendant's position here is that it is practically impossible to convict a doctor of perjury. Apart from

epistemological problems concerning the imperfections of the senses and the consequent relativity of all knowledge, it is urged Sullivan testified only as to medical opinions and beliefs which, no matter how erroneous, cannot attaint him in the absence of conclusive proof that they were not actually entertained. Defendant says the only direct or reliable proof on the issues raised by the present indictment would be his admission or confession almost tantamount to guilt.

Additionally, it is said that if contradictions exist between defendant's statements at the two murder trials, the State failed in its obligation to demonstrate the second testimony was false rather than the first.

These contentions make it important to recognize that much of Sullivan's testimony dealt with findings resulting from his examinations of the accused prisoners. To this extent, he was describing physical manifestations, exclusive of their supposed cause or psychic effect. The existence of the symptoms to which he testified is fundamentally a matter of fact, readily subject to independent verification or disproof. Most of the alleged findings were the direct product of observation and not the result of scientific tests or research. The police officers in attendance as well as Dr. Corio are, therefore, qualified to refute the truthfulness of the defendant's testimony in this respect because they had the same opportunities for observation. See *Priest v. Poleshuck,* 15 *N. J.* 557, 562 (1954); *Koccis v. State,* 56 *N. J. L.* 44 (*Sup. Ct.* 1893); 32 *C. J. S., Evidence,* § 467, *p.* 107.

Admittedly, Dr. Sullivan also gave evidence in the form of medical opinions based on his physical findings. We now refer to his own diagnosis of the individual prisoners as totally divorced from his answers to purely hypothetical questions. *Vide, Beam v. Kent,* 3 *N. J.* 210, 215 (1949). It is argued these opinions can be proved false only by direct evidence in the form of an admission, but we cannot agree. The evidence presented was more than sufficient to satisfy the rule as to *quantum* of proof which requires at least the testimony of one witness supported by strong corroborating

circumstances to obtain a conviction. *State v. Caporale,* 16 *N. J.* 373 (1954); *State v. Taylor,* 5 *N. J.* 474 (1950); *Zabriskie v. State,* 43 *N. J. L.* 640 (*E. & A.* 1881); *State v. Bulach,* 10 *N. J. Super.* 107 (*App. Div.* 1950); *State v. Ellison,* 114 *N. J. L.* 237 (*Sup. Ct.* 1935); *State v. Lupton,* 102 *N. J. L.* 530 (*Sup. Ct.* 1926); *Dodge v. State,* 24 *N. J. L.* 455 (*Sup. Cl.* 1854).

To hold that a "confession" by a doctor is an indispensible prerequisite to proving he willfully and corruptly gave false opinion testimony would place an intolerable and impossible burden on the State in its prosecution and would subject the entire judicial process, both civil and criminal, to the spectre of fraudulent testimony freely given with complete immunity and without fear of subsequent prosecution. We hold high regard for the competence and integrity of the medical profession, but we must reluctantly recognize that, like any other profession, it occasionally harbors members whose ethics are not compatible with the lofty and established standards of the group.

The present indictment was sustained in the Appellate Division, where it was said:

"The defendant's statements as to a nervous, drugged, amnestic or suggestive state of mind in the several murder suspects, may constitute perjurious testimony for the reason that it is alleged that he well knew the absence of their factual existence when he swore to them in his testimony *and that he did not hold a firm belief in their existence under the circumstances of the case.* Under either or both circumstances, an indictment may be warranted." (Emphasis supplied.) *State v. Sullivan,* 25 *N. J. Super.* 484, 492 (1953).

The strength of the law will continue only as long as it remains intimately acquainted with reality. It is not an abstract science. Considered *in vacuo,* the defendant's opinions and beliefs might possibly be unimpeachable, but we are here concerned with actualities as reflected in "the circumstances of the case." The record convinces us that these selfsame circumstances as intertwined in all of the evidence clearly and logically point to the defendant's guilt in the respects hereinafter delineated.

In general, Sullivan's statements at the second trial varied violently from those he delivered at the first. Indubitably realizing he had been called upon because of his race and special qualifications as a physician to verify the good faith of the accused's confessions and their voluntariness, he manifested in his sworn statement to the police and in the testimony he first gave that there was nothing seriously amiss physically or mentally with the murder defendants which would disqualify the confessions they had made.

On his subsequent appearance three years later, his answers were radically different. Then, in effect, he stated all of the murder defendants, for one reason or another, were totally incapable of understanding the serious consequences of their confessional act, and that their physical and mental conditions were such as to negative the voluntariness of their statements.

■ Defendant asserts a doctor is entitled to change his professional views, and we cannot quarrel with this academic observation. We, however, are concerned with the actualities of judicial proceedings, and unless such change is upon valid grounds and for good reason, there is a justifiable inference that its motivation is corrupt. When witnesses for the State directly controvert the existence of the facts upon which the new opinions are allegedly predicated, this inference may, under the circumstances, ripen into a reflection of guilt sufficient to be considered by a jury or a judge.

True, Sullivan's interrogation at the second trial was far more vigorous and searching with regard to the mental state of the respective murder defendants than at the first trial. This may possibly, as the defendant contends, have been induced by our own opinion, at 2 *N. J.* 540, where the effect of moral compulsion as a factor invalidating confessions under the due process clause was discussed.

But there was some limited cross-examination in this respect at the first trial, and on the second murder trial Sullivan was advised on several occasions of his right to refuse to answer questions relating to psychology if he deemed himself unqualified. The defendant took none of the shelter offered by the court and during the perjury trial consistently

affirmed his intention to abide by his previous testimony "if that is the record."

In the defendant's presentation the different counts of the indictment are separately reviewed, and for the sake of clarity we shall do likewise in our disposition here.

### Ralph Cooper

The first count of the indictment charges that Sullivan perjured himself by testifying as follows:

"Q. And I ask you specifically was his condition such, that you, a trained medical observer, you felt from your experience that he was under the influence of drugs at that time? A. Yes, he appeared to be so.

Q. Doctor, as a result of having your previous testimony read to you for the purpose of refreshing your recollection, and directing your attention to the condition of Ralph Cooper as a result of your examination of February 10th, or the early morning hours of the 11th, could you now state as to whether his condition was not caused by drugs? A. From the examination and observation of drowsiness and laziness as stated in the previous testimony, and redness of the eyes which indicated to me, suggested to me to ask the man if he had been smoking marijuanas, I say it could have been—it was caused by marijuanas."

This testimony considered in the context of the whole record does not satisfy us beyond a reasonable doubt that Sullivan committed perjury. With respect to the symptoms set forth, defendant consistently testified throughout both murder trials that Cooper was drowsy and lazy and showed congestion and inflammation of the eyes. There was no substantial deviation from his initial testimony at the first trial.

It is evident that Sullivan honestly thought there was at least a strong possibility Cooper had been smoking marijuana. During his examination of the suspects at police headquarters, Sullivan asked Cooper whether he had recently used "reefers." On cross-examination at the first trial, Sullivan stated: "Well, he looked to me like he had been smoking reefers." In response to the question, "Cooper you saw in such a

condition that you thought he had been taking drugs; is that right?," Sullivan testified, "I guess—yes."

Defendant's testimony at the second trial was compatible and consistent with his utterances at the first trial. There is no material conflict, and we find no evidence in the record sufficient to support a conviction on this count.

## McKinley Forrest

Giving defendant the benefit of all favorable inferences and a microscopic scrutiny of the record, we cannot sustain his conviction upon Counts 3, 7 and 8 of the indictment. These set forth portions of defendant's testimony at the second trial relating to the physical and mental condition of McKinley Forrest.

In his written statement prepared in 1948, Dr. Sullivan said Forrest "was essentially negative other than he appeared slightly excited or nervous." During the first murder trial, defendant upgraded this appraisal to "moderately excited." "Moderate" was described as a stage of excitement between "slight" and "maniacal." It was asserted this middle stage of emotional disturbance manifested itself in a tremor of the hands and Forrest's difficulty in removing his clothes, which necessitated assistance.

At the second trial, Dr. Sullivan testified that at the time of his physical examination Forrest had been in a stage of hysteria, "was so afraid he couldn't tell just what was going on," and that "it was impossible" for him to remove his clothes. These matters were stated as conclusions.

Although this testimony created an impression of mental disability which was absent at the first trial, in light of the entire record we do not find the evidence warrants a conclusion that the State adequately demonstrated the change was animated by a corrupt motive.

It may well be said a shift in emphasis rather than substance took place. Perhaps this is explainable, at least in part, by the fact that at the second trial it was disclosed to Dr. Sullivan that shortly before his physical examination of

McKinley Forrest the subject had suffered a complete nervous breakdown necessitating the services of a physician who administered sodium amytol. In reply to inquiries by counsel for the murder defendants, Dr. Sullivan attributed his change in diagnosis to this previous history of mental unbalance of which he was unaware at the first trial.

Detective Henry W. Miller, called for the State at the perjury trial, confirmed the symptom of trembling and stated Forrest stuttered and had to be assisted in removing a sweater. Dr. Corio also stated Forrest was excited, although he denied the prisoner needed help in undressing.

In light of these developments, we cannot say Sullivan's testimony with relation to Forrest diverged so substantially from the facts and his previous statements as to warrant a conclusive imputation of calculated falsehood.

However, the same meticulous perusal of the record and concern for defendant's rights which induced us to reverse the conviction on Counts 1, 3, 7 and 8 of the perjury indictment firmly convince us beyond a moral certainty of the guilt of Sullivan with respect to Counts 2, 4 and 6. Count 5 was disposed of by the trial judge's acquittal.

### COLLIS ENGLISH

The second and sixth counts of the indictment charge Sullivan perjured himself at the second trial in testifying concerning the physical condition and mental state of Collis English at the time he made his confession. In substance, these counts allege that Sullivan lied when he declared English to be a "little mumbly," a "little confused," "highly nervous" and in a psychoneurotic condition attributable to mental pressure.

Both examining doctors found that English had a serious heart murmur. At the first trial, this was the only symptom to which Dr. Sullivan testified. On cross-examination, he stated English "talked freely" and that he could recall only one prisoner being nervous, McKinley Forrest.

On preliminary examination at the second murder trial, Sullivan's initial answers were totally consistent with his

testimony at the first trial. He said his findings with regard to English were essentially negative, except for the cardiac condition, and indicated that among Cooper, Thorpe and English, only Cooper had displayed signs of a mental disturbance.

When the jury was called in, Sullivan suddenly underwent a complete transformation. In place of being a witness for the State, he was now a potent ally of the defense. English, according to this testimony, was a "psychoneurotic" whose condition had been occasioned by mental stress, leaving only the inference that questionable or unlawful police methods were the causative factor. To eliminate any doubt as to the deplorable mental condition of English, Sullivan testified he was extremely subject to suggestion, not reliable, and "under mental pressure" would be deprived of his free will. From one who "talked freely" and had no symptoms other than a "cardiac deficiency * * * well compensated," English was now, according to Sullivan's testimony, "confused," not very reliable, and "highly suggestible" as "the result of pressure" and was incompetent to execute a confession.

Additionally, Sullivan's notarized statement to the police made no reference to any of the symptoms which on the second trial he suddenly claimed to have discovered. His conclusions at the second trial were a far cry from his original findings of "essentially negative."

The detectives who appeared for the State against Dr. Sullivan and who had enjoyed frequent opportunities to observe English testified he was completely oriented, responsive and calm. They, along with Dr. Corio, denied that English mumbled or appeared confused and "highly nervous." Dr. Corio refuted the existence of a "psychoneurosis."

In our opinion, it was fully established that Dr. Sullivan, as charged in these counts, gave perjured testimony and that the totality of the circumstances proves beyond a moral certainty the evidence he gave was false, corrupt and deliberately contrived to mislead the jury.

The conviction on the second and sixth counts of the indictment is affirmed.

## JOHN MACKENZIE

Count 4 of the indictment contains Sullivan's allegedly perjurious testimony respecting his findings from the physical examination of MacKenzie.

In essence, it is charged that defendant falsely testified MacKenzie was nervous and moderately excited, "that he appeared to be in a controlled state, as if having had a drug," and that "I don't know of any other situation that might put a person in a controlled state other than the hypnosis." Read as a whole, defendant's assertions spawn the idea that MacKenzie was deprived of his free will by the administration of drugs.

We can find nothing in the record to warrant this testimony, and we must conclude that Sullivan lied as to his opinions.

In the course of the perjury trial, Dr. Corio denied the existence of any physical or behavioral indications that MacKenzie was excited and in a controlled state attributable to the taking of drugs.

Dr. Sullivan in his notarized statement described the results of his physical examination as "essentially negative." The final question contained in this document reads: "There is nothing else you can add to the above, is there doctor?" Sullivan's reply was a categorical "no."

During the first murder trial, Sullivan underwent a severe and militant interrogation concerning his examination of MacKenzie. He emphatically denied the existence of any abnormality. In reply to specific and pointed questions, he testified MacKenzie was not irrational and there was nothing "strange" about him. In addition, Sullivan said: "I can't recall him being nervous," and "he was normal."

Counsel for the murder defendants, undaunted, continued to probe. It was stated that several days after his physical examination MacKenzie became so excitable he had to be confined to a padded cell. Sullivan was asked whether this information would cause him to alter his testimony. Defend-

ant steadfastly declined to budge from the position that MacKenzie "was normal" in all respects. Relying on his considerable experience, Sullivan expressly refuted the contention that this subsequent mental disturbance indicated MacKenzie could have been under the influence of drugs at the time he was examined.

Disregarding minor conflicts and adopting the version of his testimony most favorable to defendant, nothing can justify the incredible variation between the first and second murder trials. If MacKenzie were in fact observed to be in a controlled state presumably brought on by drugs, it is not likely Sullivan would conceal this information from the police and not even mention it to his fellow examining physician, Dr. Corio. In 1948, Sullivan said he compared his findings with those of Dr. Corio and "they were apparently essentially the same."

We cannot believe Sullivan was ignorant of the purpose of his visit to police headquarters and failed to realize the State would rely upon him as an impartial witness. Yet, it was only upon trial in 1951 that he first indicated the murder defendants were timorous, drugged, nervous and excited to the point of mental distraction and docilely following a will not their own, rather than men in the full possession of their faculties.

There are material discrepancies in Sullivan's testimony which he did not attempt to reconcile or to explain. Other witnesses refuted the truthfulness of his statements. We have no reason to question either the capacities or the honesty of those witnesses. The evidence against Sullivan is compelling and excludes every other rational hypothesis save that of guilt.

We conclude the conviction should be affirmed as to Count 4, as well as Counts 2 and 6, of the perjury indictment.

Defendant further contends the verdict was the result of passion, prejudice, partiality and mistake engendered by the prosecutor's inflammatory remarks. To support this argument, reference is made to alleged inadequacies in the special findings rendered by the trial judge pursuant to

*R. R.* 3:7–1(*c*). It is said the trial judge "did not, *because he could not,* point to falsity of fact, falsity of the existence of opinions, and knowledge and corrupt intent of such falsity."

On several occasions, we have announced that we will not hesitate to reverse when the prosecutor exceeds the latitude allowed for a forceful and vigorous presentation of the State's case. See *State v. Cerce,* 22 *N. J.* 236, 247 (1956); *State v. Siciliano,* 21 *N. J.* 249, 263 (1955); *State v. D'Ippolito,* 19 *N. J.* 540, 550 (1955). Primarily, his remarks must not misrepresent the evidence nor diverge in a brazen manner from the facts of the case. See *State v. Bogen,* 13 *N. J.* 137 (1953); *State v. Grillo,* 11 *N. J.* 173, 183–184 (1952); *State v. Tansimore,* 3 *N. J.* 516, 534–536 (1950).

We do not think the statements criticized go beyond a permissibly vigorous presentation. It was necessary for the prosecutor to describe antecedent events in order to place the perjury proceeding in its proper setting and perhaps to show motive for falsification. As to the results of the two murder trials, no prejudice arose because admittedly the trial judge could have taken judicial notice of the previous records of the court. Undoubtedly, he knew of these verdicts anyway.

We also take into account the absence of a jury. By virtue of tradition, training and responsibility, the average judge is less likely to be swayed from objectivity through passion or the mere eloquence of counsel. From daily experience, he acquires a certain immunity to lawyers' emotional perorations and inevitably turns to the evidence as his ultimate guide.

An exchange between Judge Morris and defense counsel at the end of the prosecutor's summation is enlightening in this respect:

"Mr. Lord: If your Honor please, I object to these disparaging remarks that's just been read to the Court. I am sure your Honor will decide the case on the record, and your Honor will be able, without my enumerating the remarks by the prosecutor, I am sure your Honor will be able to separate not only the portrait and philosophy of the prosecutor from the record but also his personality, so I shall have no further remarks to make."

We have the same confidence in the trial court that was voiced by counsel for defendant. As he expressed himself, there was little fear that the judge below would be prejudiced by any infiltration of "inflammatory matter."

▇ Turning now to consideration of the special findings, we conclude they were sufficiently adequate and that defendant is not prejudiced on this appeal by their alleged generality. The trial judge gave a terse summary of the evidence adduced and determined "there was not any basis in fact for the medical opinions expressed by Dr. Sullivan while testifying at the second murder trial to the observations he made of the murder defendants in the First Precinct Police Station on February 10 and 12, and said opinions expressed by the defendant were false and at the time he made them he knew them to be false."

Although we find no harmful error, it is nevertheless the better practice to draw a more explicit finding which will be of greater aid on review. Here, since the special findings obviously refer to the testimony set forth verbatim in the indictment, any anticipated difficulty in ascertaining their meaning and effect was largely alleviated.

The final portion of this opinion deals with questions of admissibility.

▇ The previous testimony of Peyton L. Manning was offered to corroborate Sullivan's statements as to the nervous and excited condition of the murder defendants, particularly McKinley Forrest. Manning had accompanied Sullivan to the Trenton precinct station in 1948 and had also witnessed the signing of the confessions at the invitation of police officials. He testified on behalf of the State at the two murder trials.

Without delving into the question of whether there must be mutuality of parties to permit admission of former testimony, it is sufficient to say that the refusal in this case was proper since there was no showing that Manning was unavailable to testify in person. See *N. J. S.* 2*A*:81–14; *New York, Lake Erie & Western Ry. Co. v. Haring,* 47 *N. J. L.* 137, 139 (*E. & A.* 1885); *State v. Hogan,* 132 *N. J. L.* 148,

151 (*Sup. Ct.* 1944), reversed on other grounds 133 *N. J. L.* 59 (*E. & A.* 1945); *Cino v. Driscoll,* 130 *N. J. L.* 535, 541 (*Sup. Ct.* 1943); *Berney v. Mitchell,* 34 *N. J. L.* 337, 341 (*Sup. Ct.* 1870); 5 *Wigmore, Evidence* (*3d ed.* 1940), § 1402; *Uniform Rules of Evidence,* 63(3)(b). Defendant does not claim even now that Manning was in fact unable to take the stand.

For the same reason, the exclusion of Dr. Moore's former testimony was proper. He had treated Forrest during his mental collapse.

■ The trial court also refused to admit evidence from medical books purportedly relied upon by Sullivan in forming his diagnoses. This offer was made in order to show that defendant's opinions were conceived and reported in good faith at the second murder trial.

The trial judge could well have permitted the introduction of excerpts from these learned treatises. They were offered not to prove the truth of the matters asserted therein but solely on the issue of intent. *Cf. Lamble v. State,* 96 *N. J. L.* 231 (*E. & A.* 1921); *New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co.,* 59 *N. J. L.* 189 (*E. & A.* 1896). Rules circumscribing admissibility are also in normal practice considerably relaxed in the absence of a jury.

We, however, see no abuse of discretion under the circumstances. The offer was somewhat remote, and its exclusion was justified as discretionary. See *Bosze v. Metropolitan Life Ins. Co.,* 1 *N. J.* 5 (1948). *Cf. Iverson v. Prudential Ins. Co.,* 126 *N. J. L.* 280 (*E. & A.* 1940); *Miller v. Trans Oil Co.,* 33 *N. J. Super.* 53 (*App. Div.* 1954), affirmed 18 *N. J.* 407 (1955).

Sullivan testified his opinions were premised on certain facts he had observed. The diagnoses in the treatises were obviously based on the assumed existence of the same symptoms. If these symptoms were not actually present in the murder defendants, Sullivan's opinions were unwarranted and all of the medical treatises in the world could not affirm his honesty.

Therefore, the ruling against admission did not prejudice him. The mere existence of other opinions coinciding in form of expression with his testimony lends frail support to his protestations of good faith. Furthermore, Sullivan was later permitted to testify as to which authorities supported his views.

Objection is also made to the exclusion of two memoranda allegedly prepared by defendant at or around the time when the physical examinations were made in 1948. These were offered to demonstrate that Sullivan's testimony at the second trial was not a recent fabrication induced by the wholesale verdict of guilty in the first murder trial.

The general rule denies admission to prior consistent statements offered to bolster a witness' testimony. *State v. D'Ippolito,* 19 *N. J.* 540 (1955) ; *Gluck v. Castles Ice Cream Co.,* 104 *N. J. L.* 397 (*E. & A.* 1928); *State v. Griffin,* 19 *N. J. Super.* 581 (*App. Div.* 1952) ; 4 *Wigmore, Evidence* (*3d ed.* 1940), §§ 1124 and 1125. *Cf. Capozzoli v. Capozzoli,* 1 *N. J.* 540 (1949). An exception is made, however, when the witness has been impeached by a previous showing of bias, interest or corruption or when it is charged that the testimony in question is a "recent contrivance." In general, the evidence may then be admitted solely to sustain the credibility of the witness. *State v. Neiman,* 123 *N. J. L.* 341 (*Sup. Ct.* 1939), affirmed o. b. 124 *N. J. L.* 562 (*E. & A.* 1940) ; *State v. Kane,* 9 *N. J. Super.* 254 (*App. Div.* 1950) ; 4 *Wigmore, Evidence* (*3d ed.* 1940), §§ 1128 and 1129. See *Epstein v. National Casualty Co.,* 1 *N. J.* 409 (1949).

But this is not to say the evidence *must* be admitted under any circumstances. The trial judge always retains a wide latitude of sound discretion which the appellate court must respect. See *Epstein v. National Casualty Co., supra; State v. Kane, supra.* We think his refusal in this case was warranted by the obvious unreliability of the memoranda which had a marked tendency to vitiate their usefulness.

D–4 contains brief notations allegedly made during the course of the physicals. Apparently, it was not even referred to during the first murder trial. There, Sullivan was asked several times about the existence of a "prescription blank" containing the names of the defendants he had examined. This "blank" was produced but counsel for the murder defendants never caused it to be marked or admitted into evidence. D–4 is *not* a prescription blank and in addition to the names of the murder defendants contains penciled remarks as to their condition and some extraneous matter totally unrelated to the issues of the case.

D–4 was produced and marked at the second trial but apparently did not go into evidence. Sullivan testified he also had other notations on a prescription blank.

D–5 is a photostatic copy of an "Explanation of Findings" allegedly drawn by Sullivan several days after he went to police headquarters in 1948. As far as we can ascertain from the record, this memorandum was not referred to at either the first or second murder trials.

Sullivan testified that subsequently to preparing D–5 he placed it in a bank vault in New York at the direction of his attorney. Later, he was advised to make photostatic copies of the document. This was done, and the photostats were in turn placed in the bank vault. But it is claimed that in the interim the original of D–5 mysteriously disappeared from defendant's bedroom.

Thus, D–4 and D–5 were at all times in defendant's exclusive possession. They were allegedly written for his own use, and no one can verify the time of their making. Unlike the situation where third parties testify as to prior consistent statements and place their own credibility on the scales of justice, we have only the word of Sullivan, the party in interest, to vouch for these documents.

At the first trial, Sullivan testified he took notations during the course of the physicals on a "prescription blank." But D–4 is a letterhead. This raises the inquiry of whether defendant actually took two sets of notes at police headquarters.

Additionally, despite frequent requests for memoranda during the two murder trials, the existence of D–5 was apparently never disclosed. The original having been lost, its authenticity cannot now be investigated. We are led to inquire why the photostatic copies were so rigorously protected while the original was neglected. Sullivan's testimony with regard to D–5 borders on the incredible.

Whether D–4 and D–5 should have been accepted into evidence is highly debatable, and we can find no harmful error in the exercise of a legitimate judicial discretion which resulted in their exclusion. Furthermore, Sullivan was permitted to testify from D–4 and D–5 during his trial and their contents, at least to some extent, were entered upon the record.

When a trial judge sits alone, questions of admissibility tend to lose much of their legal distinctiveness and to fade imperceptibly into questions of weight. It is perfectly obvious that had D–4 and D–5 been admitted, their receipt would not have balanced the vast weight of the incriminatory evidence so as to affect the disposition below. Even assuming their rejection was technically in error, we conclude the defendant suffered no "manifest wrong or injury." R. R. 1:5–1(a).

Lastly, it is contended reversible error was committed in receiving evidence of the verdicts at the second murder trial, which we have already disposed of, and a radio statement made on that occasion by Dr. Sullivan expressing his happiness with the results.

The latter ruling cannot be seriously deemed to have harmed Dr. Sullivan.

Sullivan conceded the tape recording of his radio interview was accurate. Defendant's counsel admitted the "statement itself is harmless" but criticized its relevancy. The recording was played without objection. At the conclusion of the trial, the defense merely offered a general protest against the receipt of all evidence deemed to be irrelevant or otherwise objectionable.

Our study of the entire record brings us to the conclusion the defendant suffered no manifest wrong or injury and that the legal errors he claims occurred at the trial did not prejudice him in making his defense. . As was said in *State v. Orecchio,* 16 *N. J.* 125, 129 (1954) :

"The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant. * * *"

*Cf. Wilson v. Savino,* 10 *N. J.* 11 (1952) ; *Cherr v. Rubenstein,* 22 *N. J. Super.* 212 (*App. Div.* 1952).

The judgment of conviction is affirmed on Counts 2, 4 and 6 of the perjury indictment and reversed as to Counts 1, 3, 7 and 8.

WEINTRAUB, J. (dissenting). A physician was here convicted of perjury with respect to "medical opinions" given at a trial. There were eight counts. The trial court acquitted on one and convicted on the remaining seven. The majority opinion concludes defendant was innocent of four additional counts, but affirms the conviction on the remaining three.

There was another indictment for false swearing which was tried with the perjury charge. The majority opinion reads :

"The record indicates the State moved for sentence only on the perjury indictment and that no further action was taken upon the false swearing indictment."

As I read the record, there was no verdict on the false swearing indictment. Rather, the trial court deemed its

finding on the perjury charge to foreclose a conviction for false swearing based upon the same testimony. Hence we have before us only the conviction for perjury.

I do not quarrel with the abstract proposition that an opinion, as distinguished from a statement of fact, may be perjurious. But we should recognize the inherent dangers of injustice when a medical opinion is thus assailed. It is commonplace for experts to differ in equal numbers. It would be absurd to suggest that the testimony of any two will suffice to convict another who differs with them. The point is that the issue is not whether a defendant's *opinion* is false, but whether his *belief* in his opinion is false, and it is the falsity of his *belief* in that opinion which must be demonstrated. Proof that others hold a contrary opinion evidences disagreement and nothing more.

It may indeed be difficult to prove such a case. But that is exactly as it should be. The badge of criminality should be richly deserved. We do not sacrifice individuals for some prophylactic benefit to society. On the contrary, we surround men accused of crime with assurances against unfairness because we conceive that justice to the individual is the only defensible course.

This case is made still more unusual by the circumstance that the testimony charged to be false was given on cross-examination and on redirect. I agree that a departure from or an addition to direct testimony may be perjurious. But it would seem elementary that in such circumstances a charge of perjury should not be sustained unless a corrupt motive is evident. Cross-examination is rightly extolled as "the greatest legal engine ever invented for the discovery of truth," 5 *Wigmore, Evidence* (*3d ed.* 1940), § 1367, *p.* 29. Its purpose is to achieve departures from direct, both departures which are literal and departures which arise in ultimate effect from the development of additional facts or views. I am sure no one would subscribe to a *caveat* to every witness that if he deviates from his direct testimony he will thereby sign his own commitment.

It was originally held in the case of perjury that falsity had to be shown by direct and positive testimony of two witnesses. Later the rule was relaxed so that such testimony of one witness plus strong corroboration as to falsity would suffice. The weight of authority denies the efficacy of circumstantial evidence alone and the minority who differ are nonetheless more exacting in the measure of proof than in the case of other crimes. 41 *Am. Jur., Perjury,* § 65, *p.* 35; Annotations, 15 *A. L. R.* 634 (1921); 27 *A. L. R.* 857 (1923); 42 *A. L. R.* 1063 (1926); 111 *A. L. R.* 825 (1937). The wisdom of the basic rule has been questioned. But it rests not upon some ancient quirk but rather upon the public interest in advancing the investigation of truth, an interest which is furthered by protecting witnesses against retaliatory charges spawned in disappointment in the outcome of a trial. This court recently reaffirmed the rule that two witnesses or one plus strong corroboration are necessary; *State v. Caporale,* 16 *N. J.* 373, 376 (1954), wherein it quoted with approval the following from *State v. Bulach,* 10 *N. J. Super.* 107 (*App. Div.* 1950):

"* * * In this State we have adopted the test that the oath of a single witness must be supported by 'proof of *strong* corroborating circumstances of such character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence,' 'something more than the mere weight of evidence in favor of the state.' * * *"

Nor may falsity be established merely by proving prior inconsistent statements. 41 *Am. Jur., Perjury,* § 66, *p.* 36; 2 *Wharton, Criminal Law* (12th ed. 1932), § 1583, *p.* 1837. Rather, the State must charge and prove which of the two statements is perjurious.

Perjury is a high misdemeanor. We have a lesser crime, false swearing, legislatively devised to avoid the rigorous requirements which attend the charge of perjury. *State v. Kowalczyk,* 3 *N. J.* 51 (1949). Thus, in charging false swearing contradictory statements under oath may be alleged without specifying which is false and proof of the statements "is *prima facie* evidence that one or the other is false."

*N. J. S.* 2*A* :131–5. The rule requiring two witnesses or one together with corroboration is expressly made inapplicable, *N. J. S.* 2*A* :131–6. And whereas perjury, as statutorily defined, requires proof that the defendant "willfully and corruptly" committed the perjury, *N. J. S.* 2*A* :131–1, the false swearing statute requires only a showing that the defendant "willfully" swore falsely, *N. J. S.* 2*A* :131–4, "willful" being defined "to mean intentional and knowing the same to be false." *N. J. S.* 2*A* :131–7. These statutory provisions succinctly contrast perjury with false swearing. The conviction here is for perjury.

A *medical opinion* is a conclusion from *facts*. If a physician swears to the truth of those *facts,* proof by qualified observers that the facts were otherwise may well suffice to sustain perjury charged with respect to the testimony as to such facts. Where the *medical opinion* is charged to be perjurious, conflicting *medical opinions* of others may prove the *medical opinion* to be erroneous, but cannot prove that the defendant's belief in his opinion was false ; at least I cannot conceive hypothetically a case in which they could. Whether perjury charged to reside in an *opinion* may be made out by proving the falsity of the *facts* which the physician swore he observed and relied upon, is difficult to consider in a vacuum. The prudent course there would be to charge perjury as to the factual observations rather than in the opinion.

## I.

*R. R.* 3 :7–1(*c*) provides :

"In a case tried without a jury the court shall make a general finding and shall, in addition, on request, find the facts specially."

The trial court announced its general finding and some six weeks later filed its written special findings of fact. In passing, note should be made of this sequence of events. I appreciate the rule does not require the special findings to precede the general finding of guilt, but ordinarily, and

especially in a matter as complex as this one, such should be the order, and for the obvious reason that the fact-finding process may well command an acquittal notwithstanding an initial gross impression of guilt. *Cf. New Jersey Bell Telephone Co. v. Communications Workers of America,* 5 N. J. 354, 380 (1950).

The special findings recite at length the evidence *pro* and *con* without any findings of fact therein and then conclude with this single "finding":

> "I determine that there was not any basis in fact for the *medical opinions* expressed by Dr. Sullivan while testifying at the second murder trial to the observations he made of the murder defendants in the First Precinct Police Station on February 10 and 12, and the *said opinions* expressed by the defendant were false and at the time he made them he knew them to be false." (Italics added.)

The majority deem this finding to comply with the rule. In my view, it discloses no special findings of fact whatever. It adds nothing to the general finding of guilt, except to clothe it with uncertainty as to precisely what was found to have been perjurious.

Special findings were uniquely necessary in this case. The indictment charged various statements to be false, some of which were statements as to facts observed, others as to opinions or diagnoses without disclosure of all of the facts upon which the opinion or diagnosis was based, and still others consisted of answers to wholly hypothetical questions. The majority opinion classifies observations, such as to nervousness, as matters of fact rather than of medical opinion, and with this I agree. The trial court did not find that any of the factual observations to which Dr. Sullivan testified were false; rather it found falsity only with respect to "medical opinions," and did so by concluding that there "was not any basis in fact" (we are not told what the facts were found to be) for the opinions.

The trial court not having pointed to the "medical opinions" he found to be false, nor the facts from which he so concluded, we cannot turn to the record to see if his findings are

supported by the required evidence. If I correctly read the majority opinion, falsity seems to have been found with respect to Dr. Sullivan's factual observations and upon that premise in his medical opinions as well. Thus, for all we know, the majority result may well rest upon original findings diametric to those of the trial court.

Moreover the finding does not include a finding of the *mens rea* required by the statute. As already pointed out, *N. J. S.* 2A:131-1, reads:

"A person who *willfully and corruptly* commits perjury * * * is guilty of a high misdemeanor." (Italics added.)

The trial court found that Dr. Sullivan testified falsely with knowledge of falsity. But it did not find that Dr. Sullivan did so intentionally, and more importantly it did not find that he did so "corruptly." If the case had been tried before a jury and the jury had been instructed that it need find only falsity and knowledge of falsity, we would have to reverse the conviction. *Morissette v. United States,* 342 *U. S.* 246, 274, 72 *S. Ct.* 240, 96 *L. Ed.* 288 (1952). Dealing as we are with an alleged conflict between testimony given on direct and testimony on cross-examination, the element of corrupt purpose is of unusual significance.

The rule requiring special findings has an obvious purpose, to wit, to enable the appellate court to determine (a) whether the evidence will support the facts as found, and (b) whether the facts as found will support the conviction. It is impossible so to review this case, and the majority make no pretense that this is the review they give. On the contrary, the majority launch into a *de novo* trial of a charge of high misdemeanor and make their own findings with complete disregard of what the trier of facts found or did not find. Not only may the majority have found to be false what the trial court found to be true, but it is indisputable that the majority found Dr. Sullivan testified corruptly while the trial judge either found that he did not or failed to make any finding whatever.

In *State v. Catalano,* 30 *N. J. Super.* 343 (*App. Div.* 1954), a conviction for a disorderly persons offense was

reversed where the findings failed to include an essential element of the offense, to wit, the existence of an unlawful purpose. The Appellate Division expressed doubt as to its power to make new findings, but concluded that in any event it ought not to do so in that case.

Whatever the ambit of the provision in *R. R.* 1:5–4, as amended since *Catalano,* that "new or amended findings of fact may be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses," surely the rule was not intended to nullify the mandate of *R. R.* 3:7–1(*c*). *Rule* 3:7–1(*c*) was borrowed from *Federal Rule of Criminal Procedure* 23(*c*), which in turn was taken from the Connecticut practice. The purpose of special findings is to increase the protection to an accused by affording a review unavailable where trial is by jury. Hence the trial court's "finding should contain the subordinate facts found and then the conclusions reached from those subordinate facts." *State v. Frost,* 105 *Conn.* 326, 135 *A.* 446, 449 (*Sup. Ct. Err.* 1926), cited in the *Tentative Draft of Rules of New Jersey* (1948), *p.* 55.

In *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, at *page* 39 (1956), a civil proceeding, this court said:

"\* \* \* It is to be noted that the Commission did not make any specific findings with respect to the charges, but contented itself with merely making a general finding that guilt had not been established by the greater weight of the evidence. For this it must be criticized. *Abbott's Dairies, Inc., v. Armstrong,* 14 *N. J.* 319 (1954) ; *Household Finance Corporation v. Gaffney,* 11 *N. J.* 576 (1953) ; *In re Central R. Co. of New Jersey,* 29 *N. J. Super.* 32 (*App. Div.* 1953) ; *Family Finance Corporation v. Gough,* 10 *N. J. Super.* 13 (*App. Div.* 1950).

'These findings are of the utmost importance not only in insuring a responsible and just determination by the Director, but also in affording a proper basis for effective judicial review.' *Abbott's Dairies, Inc., v. Armstrong, supra,* 14 *N. J.,* at *page* 332.

If the Commission had taken the time to analyze the testimony in this case it could not possibly have reached the superficial and erroneous conclusion to reverse the borough council. \* \* \*"

In *Van Sweringen v. Van Sweringen,* 22 *N. J.* 440 (1956), a conviction for criminal contempt was reversed because the

matter was tried before the offended judge. This court did not undertake itself to try the cause on the dry record. Rather it said (22 *N. J.*, at *page* 449):

"In passing, it is to be observed that we have not considered or resolved the factual issues. It is particularly desirable in the circumstances of this case that a prejudgment of fact be made by a trial judge who has observed all the witnesses because credibility plays such a large role. The opinion of the Appellate Division lends the impression that the court was reluctant to undertake a general evaluation of the evidence taken at the trial level and as affected by the further original evidence which it ordered by deposition. This, undoubtedly, in view of the important role of the trial court in observing the witnesses at first-hand, a factor recognized in the philosophy of the court rules relating to the factual review where the findings are made by a judge rather than a jury. *R. R.* 1:5-4(*b*). * * *"

See also *New Jersey Bell Telephone Co. v. Communications Workers of America, supra* (5 *N. J.* 354, 374 to 379).

A potent consideration in Dr. Sullivan's decision to waive a jury probably was the involved nature of the charge and the consequent possibility of a conviction by a broad brush. He did not bargain for what he is now receiving. He never agreed that an appellate court sit *de novo* and decide his guilt of a high misdemeanor in a process which is tantamount to trial by deposition without opportunity to observe the witnesses and in which a conviction may be returned, as it is here, by triers of the facts who are in disagreement as to the facts.

It seems to me that fundamental fairness requires a reversal for this reason alone.

## II.

I cannot start with the conclusions of the majority that "In general, Sullivan's statements at the second trial varied violently from those he delivered at the first," and that "Then, in effect, he stated all of the murder defendants, for one reason or another, were totally incapable of understanding the serious consequences of their confessional act,

and that their physical and mental conditions were such as to negative the voluntariness of their statements." The majority say "in effect" that was Dr. Sullivan's testimony. I see no room in a perjury case to talk vaguely about atmospheric "effects." Perjury must be found in testimony given and by specific reference to it.

It is necessary to set forth some of the background.

On February 10, 1948 Dr. Sullivan was requested by the prosecutor to appear at police headquarters, without any intimation as to the purpose. When he arrived he was asked to witness the execution of statements by five of the six murder defendants, and two days later was present when the sixth defendant signed his. This was a new experience for Dr. Sullivan. Dr. Corio was similarly called without prior explanation and he, too, found himself in a new situation. Neither doctor came prepared to make a medical examination. Dr. Sullivan apparently had no equipment at all. Dr. Corio had a stethoscope. Neither had a blood pressure gauge.

Dr. Corio testified that he thought he was (a) to examine for evidence of physical brutality, and (b) to see that no physical force was used at the time the confessions were signed. His examination was limited accordingly and *he made no notes whatever*. This was in February 1948, eight years before the trial of the charges against Dr. Sullivan. In short, Dr. Corio thought his role was that of a layman. The doctors made separate physical examinations and Dr. Corio testified he did not hear much of Dr. Sullivan's interrogation of the men. Nor were the police officers in a position to hear all of Dr. Sullivan's interrogation of the men during his physical examination of them. The doctors compared their findings, but it is plain to me that they talked only of physical rather than emotional conditions. Later Dr. Sullivan gave a sworn statement to the police on oral interrogation. This is the statement which looms so large in the majority opinion. Dr. Sullivan answered all questions put to him. They related solely to the absence of signs of physical injury and to the disavowal

by the accuseds of force or deprivation as to physical wants. No questions were addressed to the emotional picture. The mere failure of Dr. Sullivan to volunteer information not embraced in the questions put cannot be elevated to the status of testimony affirmatively inconsistent with testimony later given.

At the first trial Dr. Sullivan was used by the State as a pure fact witness with no reference to professional skill. On cross-examination the approach was essentially the same, except for the development hypothetically of some testimony given by Dr. Sullivan on direct that he asked Cooper if he used "reefers" because he observed signs suggesting that Cooper might have, and the total effect of that examination was that a drug *could* have produced what Dr. Sullivan observed. The truthfulness of that testimony cannot be challenged, and the majority agree.

In reversing the convictions at the first trial, this court adverted to the subject of psychological coercion, which had been projected into the forefront by opinions of the United States Supreme Court which came down just prior to the opinion of this court. On the second trial the State again offered Dr. Sullivan as a fact witness, no different from a lay observer. But the defense then branched into a new thesis, psychological compulsion. The majority opinion states that Dr. Sullivan was offered refuge by the trial judge who suggested he might refuse to answer questions calling for opinions. I read the record precisely the other way.

The cross-examination of Dr. Sullivan was fantastic. On direct he repeated the testimony as to Cooper which suggested the possibility that marijuana had been used. Since Dr. Sullivan was a physician, the trial judge properly permitted some cross-examination along the line whether what he observed was consistent with the use of the narcotic, and of course the answer was in the affirmative. Then followed an amazing performance, wholly beyond the direct examination. Dr. Sullivan was queried hypothetically as to the effects of various drugs, etc., and what could con-

ceivably cause this, that, or the other, without any foundation in the direct examination. That course having been permitted by the trial judge over the State's objection, defense attorneys worked in relays upon the witness, traversing the course time and again, and propounding one hypothesis upon another. A direct examination of 15 printed pages was followed by 298 printed pages of further interrogation.

Dr. Sullivan dutifully answered myriads of questions as to whether A *could* cause B, giving what seems to have been the only conceivable answer, to wit, that A *could* cause B. Although, of course, Dr. Sullivan did not author the questions, and could answer only in terms of *possibilities* any question which was so framed, yet the trial court chided him because he did not answer in terms of *probabilities*. The prosecutor on redirect appeared also to seek answers in terms of probabilities when manifestly the witness could not answer in those terms without assuming facts not within his personal knowledge. Thus when the prosecutor returned to the subject of Cooper and marijuana, and Dr. Sullivan repeated that what he observed could have been caused by the narcotic but that he could not say that it was, the trial court said to the witness, "you are professionally trained," "You are a trained man," and for the third time admonished him:

"Wait a minute. Let me finish. What was the condition that you found Ralph Cooper, or any one of these defendants in when you examined them? I don't want possibilities, because anything relating to human affairs may be possible. I want reasonable probabilities, and you ought to be able to tell me what you found."

The prosecutor pressed the inquiry for some 25 additional pages and finally obtained the answer he here charged to be perjurious, "I say it could have been—it was caused by marijuana."

In short, although offered as a pure fact witness, Dr. Sullivan was converted into an expert and asked to express opinions which manifestly could not rest solely upon his

own factual observations. He thus was called upon either to guess or to use factual information acquired from other sources. Hence, when asked at the second trial to explain why he had not testified to certain views at the first trial, he answered that no one had put the questions, and that whereas he then testified to factual observations, he was now asked to give opinions and diagnoses.

Despite the fact that the trial court found falsity only in medical opinions, the State argues before us that there was falsity as to factual observations. The claim boils down to this: At the first trial Dr. Sullivan said Forrest was "moderately excited" (he said he used it as a medical term, between "slightly excited" and "maniacally excited," and hence without reference to such nervousness or excitement as one would ordinarily accept as normal under the circumstances), and in response to whether he had told counsel at a pretrial interview that Thorpe was nervous, said he recalled making that statement only about Forrest. He said English talked "very freely," but he would not say he was surprised at how freely he talked. As to MacKenzie, he said "normal is relative. I'd say as far as my observation of normality he was normal" and "I can't recall him being nervous."

It may be said that in such matters Dr. Sullivan's testimony departed on cross-examination at the second trial. But if so, which testimony was true? And if the majority find perjury therein (and I am not sure they do), then the error in refusing to admit the testimony of the unavailable witnesses, Manning and Police Captain Delate, is manifestly prejudicial. For example, Manning testified that he observed all of the men to be "highly nervous."

Apart from the fact that Dr. Sullivan's testimony at the first trial was brief and he used "moderately excited" as a recognizable medical state rather than as a lay expression, a number of circumstances will explain a departure, if there was one, in terms other than perjury. We may fairly assume that the men signing their death warrants were not as placid as guests at a tea party. It would be remarkable

if there was no sway from "normal" emotional balance. Moreover, Dr. Sullivan had not known these men prior to February 1948, but thereafter treated some of them in his capacity of jail physician and thus could contrast what he observed in February 1948 with their relatively normal demeanor thereafter. Still further, Dr. Sullivan may well have reappraised his initial observations in the light of facts later revealed to him. For example, he had not been informed on February 10, 1948 or prior to the first trial of these undisputed facts: that a few hours before Forrest signed his confession he had a severe emotional episode which included hallucinations; that Dr. Moore was summoned and left sodium amytol for the prisoner with advice to Detective Naples that it would influence Forrest's thinking for three to six hours; that nonetheless the confession was started 15 minutes thereafter. He later learned of the claim of MacKenzie that shortly before the confession he smoked cigarettes received from a turnkey, had a lapse of consciousness, and recalled nothing until two days later, when, it seems undisputed, he became so violent that he was placed in a padded cell. To this Dr. Sullivan could add a strange and undisputed performance he had witnessed on February 10, 1948, when Thorpe denied his guilt, and yet after cautionary words from Dr. Sullivan and a firm statement by the prosecutor that there were no promises, he nonetheless signed the confession, saying he would be out in a few days. Wilson had vigorously denied complicity and signed a statement to that effect, despite the accusations of the other prisoners. In the light of these circumstances and the flurry of charges which followed the first trial, it would not be strange for Dr. Sullivan to canvass his recollection and give significance to what had not initially seemed to be of moment.

At any rate, since the falsity was found to reside in medical opinions, I will turn to them.

I gather the heart of the majority finding with respect to the testimony concerning English related to Dr. Sullivan's opinion that English had a psychoneurosis.

Both Dr. Sullivan and Dr. Corio found that English suffered from a serious heart condition, which in fact resulted in several attacks during the trials and his death after the second trial. On cross in the second trial, defense counsel developed the theme that one who knew he suffered from so severe a heart condition *could* yield to persistent pressure for fear of a fatal attack, a thesis which, as far as the record goes, must be accepted as tenable. Ultimately Dr. Sullivan gave his opinion that English had a psychoneurosis.

Now, who says Dr. Sullivan's opinion was falsely held by him or, for that matter, that English was not psychoneurotic? He had never testified otherwise and no one so much as offered a contrary opinion. Dr. Corio's testimony is not all enlightening. He was interested in bumps and bruises and nothing else. He had made no notes. Confronted with prior testimony, he repeatedly accepted it because it was in the record. He protested understandably, "Counsellor, this is eight years ago." He disclaimed knowledge in the field of psychiatry and could not name a single treatise in the field. He acknowledged he had not heard all of Dr. Sullivan's interrogation of the men and, as pointed out above, the police officers heard even less, if they heard any of it. Dr. Corio conceded that a psychoneurosis could accompany English's heart condition. He later added (with reference to his own observations of MacKenzie):

"I think Doctor Sullivan will agree with me that the most individualistic person in the world is an M.D. He doesn't like to depend on another doctor for his opinion or ideas.

\*      \*      \*      \*      \*      \*      \*      \*

Q. By that you mean that— A. We are trained that way.

Q. You are trained that way, and by that you mean that one doctor will see one thing in a patient and you see— A. Yes, sir.

Q. (continuing)—or another doctor will see something entirely different in a patient? A. That is right."

Thus there was utterly no proof of the falsity of Dr. Sullivan's testimony. And to demonstrate the danger of

a judicial conclusion from the record before us that (a) English did not have a psychoneurosis and (b) Dr. Sullivan did not truthfully hold that opinion, I will go beyond the record before us and refer to expert testimony in the second murder trial.

The defense there produced a prominent psychiatrist, Dr. Frederic Wertham, who on the basis of a hypothetical question expressed the opinion that English did not sign the confession of his own free will and did not understand the consequences of signing it. I might add that Police Lieutenant Dawson (not produced by the State at the present trial) testified that English gave three different stories which he rejected as "fantastic"; that at first English was very cooperative and did not seem nervous, but "as the talking progressed and he gave us the three stories he became a little emotional and began to sweat." The State countered with a noted man in the field, Dr. James B. Spradley, who thought English to be mentally competent. But as to whether English was psychoneurotic, the State's own expert, after explaining that psychoneurosis is a big word which includes "those little peculiarities which all of us display from time to time," testified,

"Yes, I think the man is psychoneurotic."
"Q. Then, in other words, besides the heart trouble he had a psychoneurosis, is that right? A. I think he had a psychoneurosis. That is, he was showing these symptoms of fear and nervousness and so on, which come under the general classification of psychoneurosis, so that to that extent I think the Doctor's labeling of this man as psychoneurotic reaction was all right."

As to the testimony relating to MacKenzie, I pointed out above the paucity of the examination of Dr. Sullivan at the first trial. On cross-examination in the second trial Dr. Sullivan was led to say that he "might have been nervous. I don't recall stating that but— Q. Was he nervous? A. Yes, I would say he was nervous." Hypothetically it was developed that a drug *could* have caused what he observed. That was as far as the cross-examination went. It will be recalled that the court later admonished

Dr. Sullivan to speak in terms of probabilities and the testimony as to Cooper recited above was given. It was immediately thereafter that the following occurred:

"*By the Court:*
Q. Now, Doctor, you examined MacKenzie, didn't you? A. Yes, your Honor.
Q. Can you or can you not tell this Court from that examination as to whether or not he was under the influence of any drug of any form? A. Your Honor, I would say from the symptoms manifested, being relatively nervous, a drug could have been used.
*By Mr. Volpe* [the prosecutor]:
Q. (Continuing) Is that speculative or conjectural? A. That is my observation that from the condition at the time that I examined him, being coherent, that is answering and orientated to where he was in answering the questions, yet being highly nervous, it seems that he was being controlled. I mean, that is—"

At that point the prosecutor interrupted and switched to Forrest and Cooper and 24 pages later returned to MacKenzie (the indictment reads as though the following quotation followed immediately after the portion quoted above):

"Q. Now, as to Jack MacKenzie, or John MacKenzie, Doctor, would you repeat what his appearance seemed to you at the time that you saw him on the night of the 12th? A. If I recall, I stated that Jack MacKenzie appeared to be relatively calm, but nervous, that he appeared to be in a controlled state, as if having had a drug. That is to the best of my recollection, and his physical examination was essentially negative other than that.
Q. Did you ask Jack MacKenzie whether he had taken any drugs? A. I don't recall.
Q. And if no drugs had been used, what would you say could have brought about that appearance?
*         *         *         *         *         *         *         *
A. I don't know of any other situation that might put a person in a controlled state other than the hypnosis.
The Court: What does that mean?
The Witness: There are certain procedures used by psychiatrists or psychologists that can repeat certain situations so long or so often until the person will become relatively dazed and will be led along a certain line of thought as long as that person pushes those questions."

The matter was not further explored. I gather this testimony was given in the absence of the jury. In the presence

of the jury Dr. Sullivan was examined on direct only as to English and Forrest. During the cross-examination the prosecutor pleaded "surprise" and sought to neutralize the testimony. The examination and argument went on for some 100 pages to no discernible conclusion and without further reference to MacKenzie.

I do not know whether in the present case the trial court or the majority conceived the statement "he appeared to be in a controlled state" to be a factual observation or a medical opinion. To me it is a medical opinion which would have to be based upon some facts, and for that reason it is unfortunate that he was not questioned further as to the precise underlying factual detail. If the quoted statement should be deemed to be a factual observation, then surely it is a matter calling for a skilled observer with equal opportunity to observe.

The majority say:

"We can find nothing in the record to warrant this testimony, and we must conclude that Sullivan lied as to his opinions."

The burden was not upon Dr. Sullivan to prove a basis for his opinion. Rather, the burden was on the State to prove there was none and that Dr. Sullivan's belief in his opinion was false, and this by two witnesses or one witness supported by strong corroboration.

I find no reliable evidence that Dr. Sullivan did not honestly hold the opinion he gave. Dr. Sullivan had not at any time testified to the contrary, certainly not explicitly so, and if he had, such testimony would not have sufficed to sustain a conviction. The police officers surely were not qualified to express an opinion, and moreover it does not appear that they heard all of Dr. Sullivan's interrogation of MacKenzie. All the State can point to is the testimony of Dr. Corio:

"Q. Now, after the signing of this statement what examination, if any, did you and Doctor Sullivan give MacKenzie? A. He was given the same examination as the others, ears, nose and throat, his heart, his lungs, extremities, abdomen, *signs for any external signs of any physical abuse.*

Q. What did you find, Doctor?  A. They were negative, findings were negative.

Q. Was he oriented?  A. Yes, sir.

Q. Doctor, was there anything which you found in your examination which *indicated to you* John MacKenzie was nervous, that he was moderately excited, that he could have been drugged, that he was in a controlled state and that if he wasn't drugged he could have been in a hypnotic state?  A. No, sir."  (Italics added.)

Further :

"Q. That is what I want, Doctor.  A. Essentially negative means to me that there is nothing worth mentioning.  In other words, there is nothing important enough to mention.

Q. Essentially negative you mean?  A. We are talking about a *physical* examination now, is that right?

Q. Well, I want to know what it means to you in any capacity.  A. That is what it means to me."  (Italics added.)

Still further :

"Q. Were you told specifically what you should do?  A. Outside of asking me to examine the men, to see if any signs of any physical abuse were present.

Q. Anything else said?  A. Not to my knowledge, no, sir.

Q. What did you have in mind?  Amplify what you had in mind when you examined Thorpe.  What was your purpose?  A. Well, as I testified before, there was a two-fold purpose, one was to see that the man had not been abused previous to the signing of the statement, and secondly to see that no abuse was exerted to make him sign this statement from a medical standpoint.

Q. *That was all you were interested in, those two things?*  A. *Yes, sir.*"  (Italics added.)

And it was with specific reference to MacKenzie that Dr. Corio testified that "one doctor will see one thing in a patient" and "another doctor will see something entirely different."

For reasons already expressed, I would discount Dr. Corio's testimony, but if it be granted the largest possible value, to wit, that his professional observations and opinion differed from Dr. Sullivan's, I could no more conclude from that conflict that Dr. Sullivan is a perjurer than I would conclude that the tag should be placed on Dr. Corio.

Nor is it important whether we believe or disbelieve the testimony of Dr. Sullivan.  On the record before us I could

not say that I would accept his opinion. But the issue in a perjury case is not whether the trier of the facts believes the testimony accords with the ultimate truth. We cannot reach the question of truth until and unless there is testimony by two witnesses or one witness supported by strong corroboration that Dr. Sullivan did not believe in the opinion he expressed. And I cannot find that evidence on the record.

There is another aspect which gives me deep concern. MacKenzie either was or was not under the influence of a drug. If he was not, then we have the case as it was presented by the State. But if he was, there is nothing to talk about. True, it might still be maintained eruditely that a man may be guilty of perjury in telling the truth if he believed his testimony to be false, but in the circumstances of this case we would hardly let that proposition detain us from other work. The State offered no proof addressed directly to this critical fact, but rather chose to make the trial a battle of opinions. We do not have the question whether the State must produce all available evidence, 14 *Am. Jur., Criminal Law,* § 163, *p.* 881; 23 *C. J. S., Criminal Law,* § 1017, *p.* 390; rather, the question is whether it may produce no direct proof whatever and ask the court to start with a factual assumption against the defendant to the effect that MacKenzie was not under the influence of a drug.

We know MacKenzie claims to have been drugged and to have had a lapse of consciousness after smoking cigarettes received from a turnkey; and it seems to be agreed that two days later he became so violent he was placed in a padded cell. We know that in spite of his confession he was acquitted by a jury which considered that testimony and the testimony of the officers and others, including Dr. Corio, but apparently not including the questioned testimony of Dr. Sullivan. I refer to the murder trial not because the result of that trial is here evidential either way, 41 *Am. Jur., Perjury,* § 63, *p.* 36, but rather to show the existence of evidence to the knowledge of the State, and indeed evidence that apparently destroyed the probative effect of the confession. The State did not offer MacKenzie, the turnkey, or others who had

custody of MacKenzie. Should not an inference of fact be drawn in favor of Dr. Sullivan? 1 *Wharton, Criminal Evidence* (12*th ed.* 1955), § 144, *p.* 270. In any event, I am not prepared to agree that where a factual issue goes to the heart of the State's case, the prosecution may withhold all known evidence bearing upon it, and thus seek to have the court accept and start with the prosecution's private determination that a drug had not been administered. In this connection, I cannot be oblivious of the fact that sodium amytol was given to Forrest and his statement taken almost immediately thereafter.

This brings us to the element of *mens rea*. The common law concept of crime required the "concurrence of an evil-meaning mind with an evil-doing hand." *Morissette v. United States, supra* (342 *U. S.* 246, 251, 72 *S. Ct.* 240, 244, 96 *L. Ed.* 288). A wrongful act was not enough; it had to be attended by a sense of wrongdoing, a culpable state of mind. Although a criminal mind is not an ingredient of some statutory offenses of a regulatory type, *mens rea* persists as an essential element of statutory crimes borrowed from the common law, at least in the absence of clear legislative expression to the contrary. The minimum *mens rea* is that described above; more is required as to some crimes. We need not consider what sufficed at common law or today suffices in other jurisdictions with respect to perjury. In our State we have two crimes in this area, perjury and false swearing. As to perjury, a high misdemeanor, the statute plainly provides that willfulness, sufficient for false swearing, is not enough for perjury. Rather, the perjured testimony must also be given *corruptly*.

"Corruptly" is not easily defined. In the light of our statutes it must be something more than willfulness. It does not require a dollar motivation, but it does connote an intent to obtain an advantage for some one. It imports a vicious or wicked motive. See 9 *Words and Phrases, Corruptly (perm. ed.* 1940), *p.* 778; 1 *Burdick, Law of Crime* (1946), § 330*b, p.* 494.

At the argument before us the State energetically rejected any suggestion that Dr. Sullivan arranged with defense counsel to commit perjury. The thesis below and here was that Dr. Sullivan testified truthfully at the first trial and on his direct at the second trial, but that when Dr. Sullivan testified that he asked the accuseds if they were involved in the murder and that he did so because of his interest in justice, defense counsel railed at him, playing up the fact that he and the accuseds were all Negroes; that thereupon Dr. Sullivan was embarrassed or persuaded that he had been used poorly by the State, and hence decided to "throw the case" to preserve his standing within his race. All of this is possible, but the record does not bear it out. The fact is that Dr. Sullivan was pushed into the role of an expert and admonished to speak in terms of probabilities, as I have related above; that in fact much of what was charged to be perjurious, including the opinions as to Cooper and MacKenzie, came out on the prosecutor's redirect testimony and not on cross-examination. The fact is that Dr. Sullivan resisted efforts of the defense to lead him beyond the views he held. For example, when defense counsel, after vigorous examination which proved fruitful, sought by a sugary approach to get Dr. Sullivan to say that a man could smoke marijuana and believe it to be an ordinary cigarette, Dr. Sullivan testified firmly that in his opinion it was impossible. I have read this record with a willingness to believe that Dr. Sullivan told the truth as he saw it and without any corrupt purpose, however mistaken he might have been. Thus approaching his testimony, I cannot on this dry record find that he testified corruptly.

### III.

#### A.

Dr. Sullivan testified that exhibit D–4 was a record he made at the time of the examinations of the men and that exhibit D–5 contained extensions thereof made a few days later. Upon objection, they were excluded.

Dr. Sullivan was charged with fabricating his testimony on cross or redirect examination at the trial in 1951. He offered to prove the notations he made in 1948 to meet that charge. I cannot conceive of any rational basis for the rejection of the offer. Nor can I agree with the majority that competent and non-cumulative proof as to a vital matter may be excluded in the exercise of discretion.

The majority add:

"We think his refusal in this case was warranted by the obvious unreliability of the memoranda which had a marked tendency to vitiate their usefulness."

First, it should be noted that the State did not make that objection below nor did the trial court so find, but rather the State urged that the memoranda could be used only to refresh recollection, and this was the sole ground of rejection. The contention that the memoranda are unreliable was made for the first time in the brief of the State before us. I know of no principle under which an appellate court can deny a rudiment of a trial, the right to examination under oath, on the basis of factual assertions in a brief. I had thought that due process of law precluded that course.

And on what grounds do the majority find the memoranda unreliable? First it is observed that D–4 "apparently * * * was not even referred to during the first murder trial." If this is so, it would prove nothing. The majority also say that at the first trial one of the counsel referred to the paper as a prescription blank. D–4 contains Dr. Sullivan's name and address. Whether it is a prescription blank, I cannot tell from the record, but that does not bear upon admissibility. The majority say it contains "some extraneous matter totally unrelated to the issues of the case." Dr. Sullivan said this was so and offered to explain, but was not given an opportunity. The majority discuss Dr. Sullivan's testimony of safekeeping and conclude "we have only the word of Sullivan, the party in interest, to vouch for these documents." No more is necessary to require the receipt of the exhibits into evidence. We have no right to

assume that if the issue tendered to us in the brief had been fought out, the trial court would have concluded the memoranda were not genuine.

Lastly, the majority say there was no harmful error because "Sullivan was permitted to testify from D–4 and D–5 during his trial and their contents, at least to some extent, were entered upon the record." He was not permitted to "testify from D–4 and D–5" in the sense of being permitted to read any entry into the record. Rather, he was permitted merely to use the memoranda to refresh his recollection, and we here can see by comparing the answers given with the memoranda as printed in the record that entries in the memoranda were reflected in his testimony. But the trial court had no way of knowing that that was so. Thus the whole force of the offer was lost because the trial court did not have before it two vital exhibits in which Dr. Sullivan claimed to have recorded observations and opinions three years before the alleged fabrication and which bear upon the truthfulness of his testimony.

### B.

If the majority found perjury in the factual observations, then the offer of the testimony of Manning and Delate as State's witnesses in the second trial presents a significant question which may not be avoided by saying there was no showing that they were unavailable. The fact of unavailability was accepted by both sides and the trial court. The objection raised was solely the one which the majority decline to consider, and this was the single basis of the trial court's ruling. In fact, earlier in the trial the prosecutor himself represented that Delate was unavailable, adding "I just make that statement for the information on the record," which I interpret to have been intended to account for the failure to produce a known witness. Had there been the slightest suggestion below that the preliminary proof was desired, obviously it would have been forthcoming.

I will not lengthen this opinion by discussing the issue presented, since as I see this case, we are here concerned

with medical opinions and I do not find the required proof of falsity with respect to them.

## C.

The remaining issue relates to the exclusion of medical treatises upon which Dr. Sullivan testified he relied in reaching his opinions. I agree with the majority that they should have been received. I cannot agree that there is any room for discretion in that regard. Those treatises are constituent facts, indistinguishable from any other fact which led to Dr. Sullivan's opinion, and surely bore upon the issue of criminal intent.

Nor can I concur with the statement of the majority:

"Sullivan testified his opinions were premised on certain facts he observed. The diagnoses in the treatises were obviously based on the assumed existence of the same symptoms. If these symptoms were not actually present in the murder defendants, Sullivan's opinions were unwarranted and all the medical treatises in the world could not affirm his honesty."

Here the majority appear to find perjury in the medical opinions upon a subsidiary finding of perjury as to observations. That approach not only departs from the trial court's findings, but in addition assumes that the full bases of Dr. Sullivan's opinions were spread on the record and that a reference to the treatises would have added nothing. It is more probable that if the offer had been received, there would have followed a plainer delineation of the bases of the opinions. In the muddled state of this matter, I cannot say that the exclusion was not prejudicial.

For these reasons, I would reverse the judgment as to all counts here under review.

Mr. Justice HEHER and Mr. Justice JACOBS have authorized me to state that they join in this opinion.

*For affirmance in part*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For reversal*—Justices HEHER, JACOBS and WEINTRAUB—3.