9 N.J. Super. 254 (1950)
75 A.2d 894
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MATT KANE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 1950.
Decided October 18, 1950.
*257 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Abraham L. Friedman argued the cause for appellant (Messrs. Rothbard, Harris & Oxfeld, attorneys).
Mr. Walter G. Winne argued the cause for respondent (Mr. Winne and Mr. Max Eisenstein, attorneys).
The opinion of the court was delivered by WM. J. BRENNAN, J.A.D.
Kane was convicted in the Bergen County Court of setting fire to a building, R.S. 2:109-3. The chief witness against him was an accomplice, Callandrillo, who pleaded guilty to the same indictment.
*258 Both men were striking employees of Continental Paper Company, in Bogota. Callandrillo testified that he and Kane were doing picket duty the night of September 28, 1949, when Kane asked his help to carry out the request of one Adamo, the strike leader, to burn down a company building. He said he went home and returned with his automobile, picked up Kane, who had meanwhile obtained a gallon jug of kerosene from a nearby lunchroom building, and that they drove to Old Mill Road and parked. He testified that Kane left his hat on a seat in the car and that they both headed for the company's buildings, Kane carrying the jug; that when they reached the timekeeper's building, Kane hid the jug in some bushes near the building while they tried several doors until Kane found the door to the timekeeper's office open and said "We'll burn this down;" that Kane took the jug from the bushes and went toward the timekeeper's office, that he told Kane he would go back and start the car and did so but couldn't start it, that he raised the car hood to find the trouble, and at that instant noticed a flash of light from the timekeeper's office, was scared, grabbed Kane's hat and his own lunch from the car and ran about a half mile to the plant of Arrow Rubber Company where eight weeks before he had obtained temporary employment on the night shift; that he hid Kane's cap in a refuse carton in the smoking room at the Arrow plant, worked until 6:30 the following morning when he feigned that his car had been stolen from the plant's parking lot during the night, that the Bogota police were called by an Arrow Company employee and the officers took him to Old Mill Road where the car had been left, after which he was taken to the Bogota Police Station and then to the Bergen County Prosecutor's office.
Kane's cap was received in evidence after two police officers testified to finding it on the morning of September 29th in the rubbish container at the Arrow plant where Callandrillo had said he hid it, and when Kane took the stand he admitted the cap was his.
Callandrillo's wife testified that Kane, whom she had never seen before, came to her house about 8:15 A.M. on September *259 29th, identified himself by his nickname "Rabbit" and inquired for Callandrillo. Callandrillo's night foreman at the Arrow plant, who likewise said he had never seen Kane before, testified that Kane and one Sands had come to the shop during the same morning looking for Callandrillo.
Kane's defense was an alibi. He admitted seeing Callandrillo on the picket line on September 28th but said it was early that morning. He testified he played cards with him at that time on the running board of Callandrillo's car and said he had put his cap in the car during the game. He categorically denied seeing Callandrillo on the picket line that night and said he spent the evening in a tent playing cards with other pickets until he went to bed in a trailer nearby where he said he was asleep until 6:30 or 7 of the following morning. He admitted going to Callandrillo's home and to the Arrow plant but said he was simply accompanying Sands, a member of the strikers' welfare committee, that Sands had asked him to go along, telling him Callandrillo wanted to see him, Sands. Sands testified to the same effect but admitted that at Callandrillo's home, Kane, not Sands, talked to Mrs. Callandrillo. Two strikers corroborated Kane's alibi and said that they saw Kane asleep in the trailer at the time the crime was alleged to have been committed.
Callandrillo gave the prosecutor a statement on the morning of September 29th; it was not admitted in evidence but it is clear from the testimony that it implicated Kane. Kane was picked up and brought to the court house where he was questioned in the prosecutor's office during the day and twice denied that he had had anything to do with setting the fire. Callandrillo was brought in later in the afternoon to confront Kane and in Kane's presence accused Kane of complicity in the crime, whereupon Kane, according to Callandrillo's testimony, said nothing, and according to DeMarco, a prosecutor's detective, said "I have nothing to say."
Kane asserts that the trial court erred in admitting this testimony of his silence when confronted and accused by Callandrillo. We do not agree. While a contrary view obtains *260 in some jurisdictions, Annotations, 80 A.L.R. 1259 and 115 A.L.R. 1517, and Wharton, Criminal Evidence, 11th ed. (1935), Vol. 2, § 660 et seq., in New Jersey "The circumstance that the defendant is under arrest does not by itself make the declaration inadmissible." State v. Toohey, 6 N.J. Super. 97 (App. Div. 1950), citing State v. Rosa, 72 N.J.L. 462 (E. & A. 1905); State v. Morris, 94 N.J.L. 19; affirmed, Id., 94 N.J.L. 567 (1920); "the general rule is entirely settled that evidence is admissible of a statement relevant to the offense charged if it is made in the presence of the accused and if the truth of the statement is not denied by him at the time. Donnelly v. State, 26 N.J.L. [[*]463] 504; affirmed, Id., 26 N.J.L. 601 (1857); State v. Friedman, 136 N.J.L. 527 (E. & A. 1948);" and further, "If the witness testifies that the defendant did speak up and deny the charge, proof of the accusatory statement is not admissible." Ibid. Nor should the testimony be admitted if it appears that the declaration "was made in the course of a judicial inquiry, or when circumstances existed which rendered a reply inexpedient or improper, or that fear, doubts of his rights, or a belief that his security would be better promoted by silence than by a response, governed him at the time * * *." Donnelly v. State, supra, at page 612.
Kane says in his brief that before the confrontation "the defendant was advised by counsel to say nothing." Proof of silence under such circumstances might properly raise a question whether the silence could be made evidence against him. Cf. Roesel v. State, 62 N.J.L. 216, at 235 (E. & A. 1898). However, the record here is to the contrary of the assertion in the brief. The suggestion that Kane was silent on the advice of counsel was not mentioned until Kane took the stand and then on cross-examination he steadfastly denied that when his lawyer accompanied him to the prosecutor's office on September 29th he heard the lawyer, in the elevator, tell him to keep his "mouth shut, deny it and tell them nothing."
The trial judge's charge dwelt at some length as to the significance to be given Kane's silence both as to this *261 incident and as to another, abandoned at the oral argument as a reason for reversal, which occurred when Kane, Callandrillo and Adamo met at a lawyer's office and Callandrillo related to the lawyer the contents of the statement he had made to the prosecutor. The charge carefully instructed the jury that "silence alone is very slight evidence of guilt and aside from the inference which may arise from the attendant circumstances should be received with caution as proof of guilt," and if from the attendant circumstances "he shall show to the satisfaction of the jury that his silence was caused by reasons or prompted by motives consistent with his innocence, the accusatory statements and his silence should be disregarded, and among the many reasons which he may show for silence would be that a few minutes before he had denied a similar accusation." This was a full and fair exposition of the law applicable to the circumstances proved and we perceive no error in the admission of the testimony.
It is next argued that it was error to permit Callandrillo on his redirect examination to testify that in his attorney's office in Newark, in the presence of Kane, Callandrillo had repeated, in substance, what he had testified in court, and that he had there stated what was contained in the statement which he had given the prosecutor on September 29th upon his arrest, which statement contained matter involving Kane in the crime. The ruling in question appears in the record as follows (pp. 79a-80a):
"Q. Did you make any statement then in the presence of Kane?

* * * * * * *
"A. Yes, I will answer it. Mr. Rothbard asked me what was in the statement that I gave the Prosecutor and I told him and his secretary took down the notes and then we left.
"Q. And in the statement that you told Mr. Rothbard, which his secretary took down, did you repeat in substance in that statement what you have testified to today?
"Mr. Kapp: I object to it.
"The Court: I will allow it.

* * * * * * *
"A. Yes.
"Q. And the statement that you referred to that you told Mr. Rothbard you gave the prosecutor's office, was given to the prosecutor's office when? A. The first day I was arrested.
*262 "Q. Is that the time when you informed the prosecutor's office that Kane was the man involved in this fire? A. Yes.
"Mr. Kapp: I object to this, if your Honor, please, and I ask that this entire line be stricken as being improper redirect examination.
"The Court: I think it all comes under the heading of rehabilitation of witnesses; see cases in 123 New Jersey Law 344 and 133 New Jersey Law 427.
"Mr. Kapp: The Nieman case is, I think, one that I submit, sir, that there is no question of rehabilitation in this situation.
"The Court: I think there is and I am allowing the testimony to come in only on this theory. I think I ought to explain to the jury now what the reason is for letting this in, so that there will be no confusion about it. The law is that when the credibility of a witness has been attacked on cross-examination, it may be shown in evidence that long prior to the trial here, whatever the judicial proceeding was, that the witness made similar statements, not for the purpose of proving the truth of the statements, but simply for the purpose of showing that he had been consistent in what he said, that he did not merely make it up on the witness stand here today."
Kane's argument raises the often difficult question of the admissibility of prior consistent statements to bolster the credit of a witness' testimony. Annotation, 140 A.L.R. 21. The problem is perhaps more troublesome when the witness is an accomplice who is always under a suspicion of discredit because of the strong motive, implicit in his position, to save himself or ameliorate his punishment by securing through his testimony the conviction of his companions. Some authorities have thought this suspicion is itself a reason sufficient to admit his prior statement to show "that at some time anterior to the period when the temptation to falsify may be deemed to have arisen he made a statement which is consistent with his sworn testimony." People v. Katz, 209 N.Y. 311, 103 N.E. 305 (1913); People v. Vane, 12 Wend. (N.Y.) 78 (1834); State v. Williams, 129 N.C. 581, 40 S.E. 84 (Sup. Ct. No. Carolina 1901). The more generally accepted, and we think the sounder view, 4 Wigmore on Evidence, 3rd ed. (1940), § 1128(2), is not usually to permit evidence that the accomplice made a former statement similar to his testimony in the case on trial except when the trial judge in the exercise of sound discretion is satisfied that the credibility of the *263 witness is impeached in such manner and to such extent that the trial judge feels convinced that the witness is entitled to the support. Cf. State v. Cerligione, 133 N.J.L. 424, at 427; affirmed, 134 N.J.L. 617 (E. & A. 1946). The evidence is admitted in such circumstance solely to sustain the credibility of the witness, not as direct or corroborative evidence of the facts stated upon the stand by the witness, and the trial judge should properly instruct the jury concerning its real purpose and value. Cf. State v. Neiman, 123 N.J.L. 341; affirmed, 124 N.J.L. 562 (E. & A. 1940); State v. Cerligione, supra. It is apparent here that the trial judge explained his ruling in such plain terms that the jury must have understood that the office of the testimony was simply to support Callandrillo's credibility.
Kane contends that the predicate of impeachment of Callandrillo is not shown by this record. Impeachment has been held to occur when the attempt to impeach is by imputation, or proof, of a motive to falsify, bias or interest. "The general rule is that when a witness has been impeached by an attack upon his credibility, tending to show that his testimony is a fabrication of recent date or is colored, distorted and falsified through the influence of some strong personal motive, his statements, made on occasions so near to the event involved, and so long anterior to the litigation that the effect of his speech could not have been foreseen, are admissible." State v. Neiman, supra. Cross-examination is a sufficient method of impeachment for this purpose. People v. Singer, 300 N.Y. 120, 89 N.E.2d 710 (1949); Note, "Rehabilitation of Witness by Prior Consistent Statements," 35 Cornell Law Quarterly 867 (1950). But see cases contra, 140 A.L.R. 154; 58 Am. Jur., "Witnesses," § 823, note 19.
The vigorous cross-examination of Callandrillo by Kane's attorney plainly was designed to suggest and did suggest to the jury that Callandrillo hoped for clemency for himself, and that his trial testimony was a fabrication, as a reward for which he hoped for special consideration. It was developed on his cross-examination that Callandrillo had been *264 sentenced on March 29th to a term of two and a half to three years after retracting his not guilty plea and pleading guilty to the indictment; that on the day of his sentence and just after it was imposed, he was visited in jail by two prosecutor's detectives; that he then retained another lawyer who, two days later, March 31st, successfully applied for the setting aside of the sentence with the plea that Callandrillo, who after the indictment had advised the prosecutor that he would not testify against Kane, was willing now to do so. Kane's counsel then questioned Callandrillo, in the jury's presence, as follows (pp. 62a-63a):
"Q. What is the deal you made in this case to testify? What kind of a deal have you got with these men here  I am speaking of DeMarco and Stewart  about your testifying against this boy? What are you supposed to get for that?
"Mr. Eisenstein: If your Honor please, I think he ought to ask him first whether or not he has any deal.
"Mr. Kapp: I think it is perfectly apparent from the testimony thus far my question is justified.
"The Court: I think first of all you ought to establish the fact, if it is a fact, as to whether these two men have any power over his sentence because after all, under the law, a judge is the only one that has that power.
"Mr. Kapp: That may be, sir, but I think the record speaks volumes. This sentence was set aside and I think the jury are entitled to all of the facts.
"The Court: "I hope you are not intimating I have any deal with Stewart and DeMarco about what this man's sentence was going to be?
"Mr. Kapp: No, your Honor. I think I was very careful in asking what the deal was with these two gentlemen who visited him.
"By the Court:
"Q. Did you think either one of these two men had any power over your sentence? A. No, they had none. I didn't think they had any power over my sentence.
"By Mr. Kapp:
"Q. What is the deal that you made with them? A. We didn't make any deal.
"Q. But after you got through talking to them you had agreed, had you not, that you were going to involve Matt Kane? A. No, no. He just told me that he was going to try to help me.
"Q. Didn't you agree to testify against Matt Kane? A. Yes, I agreed to testify.
*265 "Q. That was after you got the two and a half years? A. Yes.
"Q. You refused to involve him before you were sentenced, didn't you? A. I refused him?
"Q. Yes. A. I didn't refuse."
We think the insinuation of a "deal" is very clear and laid the necessary foundation for the challenged testimony. People v. Singer, supra. This called into play the exercise of judicial discretion and under the circumstances shown the ruling allowing the testimony was not error; we have seen that the ruling was accompanied by a carefully phrased explanation of the limited purpose of the testimony.
Kane next urges as error the refusal of the trial judge to strike as unresponsive an answer to a question asked of Callandrillo on cross-examination. The answer was one which the witness had already given on his direct examination and was therefore not prejudicial to Kane.
Kane's final points are that the verdict was against the weight of the evidence and that the court erred in denying certain requests to charge pertaining to the law applicable to the testimony of confessed accomplices. The arguments advanced are substantially identical and go to the sufficiency of the testimony corroborating the testimony of the accomplice Callandrillo. Corroboration of an accomplice's testimony is not legally necessary; State v. Bove, 98 N.J.L. 350; affirmed, 98 N.J.L. 576 (E. & A. 1923); in any event the trial judge fully and fairly instructed the jury to treat Callandrillo's testimony with caution and to consider carefully whether there was corroborative evidence connecting Kane with the crime, commenting specially on the testimony as to Kane's cap and Kane's silence when on two occasions he was accused of complicity. The charge met the test laid down in State v. Hyer, 39 N.J.L. 598 (Sup. Ct. 1877).
The judgment of conviction is affirmed.