115 N.J. Super. 140 (1971)
278 A.2d 504
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BRUCE KING, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 1971.
Decided June 10, 1971.
*141 Before Judges CONFORD, KOLOVSKY and CARTON.
Mrs. Rita L. Bender, designated counsel, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
*142 Mr. Wilbur H. Mathesius, First Assistant Prosecutor, argued the cause for respondent (Mr. Bruce M. Schragger, Mercer County Prosecutor, attorney).
The opinion of the court was delivered by CONFORD, P.J.A.D.
After a trial of defendant-appellant King and co-defendants Allen and Clark, the latter were acquitted and King convicted of the murder of Adam Mueller and Joseph Beismann in Trenton on the late evening of March 13, 1969. The jury recommended life imprisonment on each conviction, and King was sentenced to terms of life imprisonment on each, to be served consecutively.

* * * * * * * *
[Here the court discusses the testimony of various witnesses to the case]
The most important State witness was Beverly Peters, a/k/a Vevlyn Jackson. Between 11 P.M. and midnight on the night of the murders, Miss Peters was standing on the corner outside Sid's Bar. After about 20 minutes, she saw two white men emerge from Skopa's Bar across the street. As the men were crossing the street to the corner diagonally opposite the corner on which Miss Peters stood, she saw Glover [a companion of the defendants] and defendants King, Clark and Allen emerge from Skopa's Bar. The four ran up to the two white men, and King stuck his gun up at the older man's (Beismann's) head. The younger man (Mueller), upon seeing this, fled down Brunswick Avenue towards Sanford Street. King thereupon took his gun from Beismann's head, and ran after Mueller; he shot at the fleeing Mueller, apparently twice, and Miss Peters saw Mueller fall down in the street. At this, Clark, Allen, and Glover ran into Sid's Bar, while King took Beismann down Old Rose Street. Miss Peters did not see what King did with Beismann, because she also went into Sid's Bar at that point. Miss Peters' boyfriend, Curtis Jackson, the father of her son, was in Sid's Bar at the time. *143 Miss Peters told Jackson about what she had seen, and Jackson suggested that they leave because Jackson had been in trouble with the law, as had Miss Peters, and he was afraid that she would be called as a witness in this matter. Jackson and Miss Peters left Sid's Bar and went home together.

* * * * * * * *
[Here the court discusses additional testimony of witnesses in the case.]
The principal ground of appeal is the contention that the court erred in allowing the State at the conclusion of its case, over strenuous defense objection, to adduce in evidence Miss Peters' testimony given before the Grand Jury on April 29, 1969 and a statement she gave the police March 14, 1969 which in substance were to the same effect as her testimony to the trial. (The case was tried from November 5 through November 13, 1969). In so doing, the trial judge accepted the State's contention that it was entitled to bolster Miss Peters' credibility because her cross-examination was designed to suggest to the jury that her testimony was a recent fabrication. See Evidence Rule 20 which states: "* * * No evidence to support the credibility of a witness shall be admitted except to meet a charge of recent fabrication of testimony."
Prior to the promulgation of the evidence rules in 1967 this State allowed somewhat broader latitude in supporting by prior consistent statements the credibility of a witness assailed on cross-examination.
"It is well established that previous statements of a witness are ordinarily not admissible to strengthen and corroborate his testimony, but the general rule is that when a witness has been impeached by an attack upon his credibility, tending to show that his testimony is a fabrication of recent date or is colored, distorted, and falsified through the influence of some strong personal motive, his statements made on occasions so near to the event involved, and so long anterior to the litigation that the effect of his speech could not have been foreseen, are admissible."
State v. Neiman, 123 N.J.L. 341, 344 (Sup. Ct. 1939), aff'd o.b. 124 N.J.L. 562 (E. & A. 1940).
*144 See also State v. Kane, 9 N.J. Super. 254, 262-264 (App. Div. 1950).
The version of Rule 20 first adopted by the Supreme Court (September 14, 1964) but which never became effective, read, in pertinent part:
"* * * No evidence to support the credibility of a witness shall be admitted except to meet a charge of willful falsification of testimony."
The change to the now-existing version was accomplished at a conference of the Legislative Commission serving pursuant to SCR 28 (1966) and SCR 1 (1967) with the Supreme Court. See Report of the Rules of Evidence Study Commission (1967) p. 7.
The express limitation in Evidence Rule 20 to charges of "recent fabrication" should, in the light of the prior history of the rule and the evolution of Rule 20 as it now stands, ordinarily call for adherence to that formulation as the only criterion for admissibility of prior consistent statements of the witness assailed to support credibility. However, we find that the cross-examination of the witness Peters by the several defense counsel here was such as to permit the trial court properly to determine that it met the criterion of charge of recent fabrication.
In ruling in favor of admission of the evidence the trial court relied largely upon the following portions of the cross-examinations of Miss Peters:
"Q. Isn't it true you made up this story to help protect [your boyfriend] Curtis?
A. Protect him from what?
Q. Wasn't he one of the people there?
A. No.

* * * * * * * *
Q. Do you recall talking to Mr. DeFusco on October 28th [eight days before the trial] in front of Detective Vorhees, Detective Fitzgerald down in the County Jail?
*145 A. Who?
Q. You were talking to Thomas DeFusco, don't you remember, down in the County Jail on October 28th?
A. Yes.
Q. Of this year?
A. Yes.
Q. Do you recall telling him that Curtis told you to give the police a statement to keep him out of trouble or he would get in trouble?
A. Yes.
Q. He is the one that told you to make this story up, didn't he?
A. I told him that because my probation officer gave me .
Q. Did you make that statement?
A. I told him that because my probation officer gave me three months in jail and I said I wasn't going to witness.
Q. Did you tell him that story that Curtis told me to get him out?
A. When I got in Court I was going to change my statement to say that Curtis did it.
Q. Is that what you told him?
A. I told the man that.

* * * * * * * *
THE COURT: In response to any of those questions that you wish to explain, go ahead, try to explain to him now.
A. That I told Mr. Fitzgerald that I wasn't going to witness in this case because I was mad at him for getting me three months. I wouldn't have got three months for violation of probation. He said I was being spiteful and ignorant. I said I didn't care, if they had to go to jail it wouldn't be for me and I won't witness for that.

* * * * * * * *
Q. Did you tell him that, Thomas DeFusco, that Curtis told you to give the police a statement, a story?
A. I didn't tell him that, I said I was going to say that in Court and they said why would you change your statement. I said because I am doing three months, because if I have to do three months, let me do it on my own.

* * * * * * * *
Q. Who decided you should make the trigger man King, you or Curtis?
[objection sustained]

* * * * * * * *
Q. Now, when you were interviewed in the County Jail by Detective DeFusco and Officer Fitzgerald and Voorhees, is it correct that you told them that you weren't going to be a witness?
A. Yes.
Q. Is it correct that you told them that Curtis had told you to make this statement?
A. I said that I was going to tell a lie when I came over here and he said I would be ruining my life for purjury [sic]. I would get a lot of time for that and I said, well, I am going to tell a lie anyway.
*146 Q. Didn't you tell them that Curtis had told you to tell this story?
A. I would say Curtis told me to say it.

* * * * * * * *
Q. Now, Miss Peters, on certain circumstances, would you tell a lie?
A. Yes.
Q. Is that true?
A. You would too.
Q. Under certain circumstances would you lie under oath?
A. No, I am not lying now.
Q. Did you just testify in answer to Mr. Turner's questions that you were going to come here and lie and you were going to do it anyway?
A. That is what I told them.
Q. Would you lie to protect someone that is close to you?
Mr. Phelan: Objection.
THE COURT: Sustained.
Mr. Schroth: She testified she said she was going to come here and lie.

* * * * * * * *
Q. In fact, you are lying now, aren't you?
A. No. I had already made my statement. I said I was going to lie in Court and change my statement." (Emphasis by court.)
A "charge" of recent fabrication can be effected through implication by the cross-examiner as well as by direct accusation of the witness. In fact that is the usual way in which the charge is made. See State v. Kane, supra (9 N.J. Super., at 263-265). Defendant argues that the cross-examination did not bring out any recent fabrication by Miss Peters but only suggested that her testimonial version of the affair was a lie from the time of the very first statement of the witness to the police and that it was contrived by her to protect Jackson. We think the trend of the cross-examinations, especially toward their conclusion, went considerably beyond that. The allusion to the threat by the witness to the detectives a week before trial that she intended to lie at the trial, coupled closely with the outright assertion of the examiner that she was in fact lying in implicating King, could fairly have been held by the trial judge to have conveyed the impression to the jury that the witness had recently decided to lie to involve King. For present purposes, it is the *147 impression the cross-examiner makes upon the jury in the heat of the trial rather than what an appellate court would discern from a coldly analytical study of the testimony which must control review of the somewhat discretionary exercise of judgment made by the trial judge in the matter. We find no error.
Beyond the foregoing, a finding of prejudice would be dubious even were the admission of the evidence technically erroneous. The cross-examination was fairly rife with implications that Miss Peters had given statements to the police inculpating King.
Moreover, the other unexceptionable evidence adduced by the State, direct and circumstantial, of King's guilt was overwhelming.

* * *
[The court here considers and rejects other grounds of appeal.]
Judgment affirmed.