RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is only binding on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1598-14T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

O.L.,

 Defendant-Appellant.

_________________________________________

 Submitted September 28, 2016 – Decided September 12, 2017

 Before Judges Simonelli and Gooden Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Monmouth County,
 Indictment No. 12-08-1393.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Alan I. Smith, Designated
 Counsel, on the brief).

 Christopher J. Gramiccioni, Monmouth County
 Prosecutor, attorney for respondent (Mary R.
 Juliano, Assistant Prosecutor, of counsel and
 on the brief).

PER CURIAM

 Defendant appeals from his judgment of conviction stemming

from engaging in sexual conduct with his girlfriend's fourteen-
year-old sister, C.H. He was charged in an indictment with second-

degree sexual assault, N.J.S.A. 2C:14-2(c)(4) (count one);1

second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count two);

and third-degree endangering the welfare of a child, N.J.S.A.

2C:24-4(a) (count three). A jury trial was conducted from May 6

through 15, 2014, during which, with defendant's consent, count

one was amended to fourth-degree criminal sexual contact, N.J.S.A.

2C:14-3(b). The jury found defendant not guilty on counts one and

two, but guilty on count three. He was sentenced to a five-year

term of imprisonment and a special sentence of parole supervision

for life, N.J.S.A. 2C:43-6.4. All applicable fines and penalties

were imposed.

 On appeal, defendant argues:

 POINT I - THE TRIAL COURT'S RULING ADMITTING
 C.H.'S STATEMENT TO DETECTIVE OTLOWSKI AND
 C.H.'S GRAND JURY TESTIMONY INTO EVIDENCE AS
 PRIOR CONSISTENT STATEMENTS WAS REVERSIBLE
 ERROR.

 POINT II - THE TRIAL COURT'S RULING DENYING
 DEFENDANT'S MOTION FOR DISCOVERY WAS
 REVERSIBLE ERROR BECAUSE DEFENDANT
 ESTABLISHED A LEGITIMATE CONSTITUTIONAL BASIS

1
 Count one of the indictment erroneously indicated that the
offense charged was second-degree sexual assault contrary to
N.J.S.A. 2C:14-2(b). Prior to trial, the indictment was amended
pursuant to Rule 3:7-4 to change the statutory citation to N.J.S.A.
2C:14-2(c)(4) to correspond with the language in the indictment.

 2 A-1598-14T1
 TO COMPEL PRODUCTION OF C.H.'S MEDICAL,
 PSYCHOLOGICAL, DCPP,2 AND SCHOOL RECORDS.

 POINT III – DEFENDANT'S MOTION FOR A JUDGMENT
 OF ACQUITTAL NOTWITHSTANDING THE JURY VERDICT
 ON COUNT THREE, OR ALTERNATIVELY FOR A NEW
 TRIAL ON COUNT THREE, SHOULD HAVE BEEN GRANTED
 BECAUSE THERE EXISTED INSUFFICIENT EVIDENCE TO
 FIND DEFENDANT GUILTY OF ENDANGERING, AND
 BECAUSE THE VERDICT INCONSISTENCY THAT
 RESULTED FROM THE TRIAL COURT'S FAULTY JURY
 INSTRUCTION ON COUNT THREE CONSTITUTED A
 MANIFEST INJUSTICE UNDER THE LAW.

 POINT IV - THE FIVE (5) YEAR BASE TERM IMPOSED
 ON DEFENDANT'S CONVICTION FOR ENDANGERING THE
 WELFARE OF A CHILD ON COUNT THREE WAS
 MANIFESTLY EXCESSIVE.

We reject these arguments and affirm.

 I.

 We discern the following facts from the record. At trial,

C.H. testified that defendant, who was eleven years older, engaged

in sexual conduct with her on multiple occasions from July 1, 2011

through April 21, 2012. Initially, the conduct consisted of mutual

flirting, texting and exchanging nude photos of each other at

defendant's request. C.H. admitted having a crush on defendant,

which angered her older sister, S.Q. On one occasion, when C.H.

and her younger sister went to visit S.Q., who was then living

with defendant in an apartment, defendant touched C.H.'s thigh and

vagina over her clothing and told C.H. that he "wanted to f**k"

2
 Referring to the Division of Child Protection and Permanency.

 3 A-1598-14T1
her. S.Q. was not home at the time and defendant stopped when

C.H.'s younger sister walked into the room.

 The next incident occurred at C.H.'s house. Defendant and

C.H. went out to the backyard where defendant apologized to C.H.

while they were sitting on the grass. Thereafter, defendant

grabbed C.H., told her again that he "wanted to f**k" her, got on

top of her, exposed his penis and rubbed it "near [her] vagina."

Defendant eventually stopped at C.H.'s request and they went back

inside the house. On other occasions, defendant repeatedly touched

C.H. inappropriately while they were at her house and continued

telling her that he "wanted to f**k" her. C.H. consistently told

him "no" because "he was with [her] older sister." However, C.H.

did not tell anyone about the incidents because she did not want

defendant "to get in trouble."

 On April 21, 2012, while the family was celebrating C.H.'s

younger sister's first communion at their home, C.H.'s mother

asked C.H. to get chairs from the basement. Defendant went with

C.H. to assist her. After they finished and were walking up the

basement stairs, defendant "grabbed" C.H. from behind and "started

to kiss" her "with his tongue in [her] mouth." Defendant also

thrust his hand into the leg of C.H.'s shorts and penetrated her

vagina with his fingers.

 4 A-1598-14T1
 While they were on the stairs, C.H.'s mother called out "who's

there" from the bottom of the staircase. Although it was dark,

C.H.'s mother could tell that someone was present. At that point,

C.H. fled upstairs to her bedroom with her mother following her.

Based on C.H.'s reaction and their location on the stairs, C.H.'s

mother believed that something sexual had occurred between C.H.

and defendant. In the bedroom, C.H.'s mother screamed "[h]ow

could you do that to your sister," who was then pregnant with

defendant's child. C.H. cried and never responded to her mother.

Eventually, C.H. and her mother rejoined the party. C.H.'s mother

did not pursue it at that point because she did not want to ruin

the celebration.

 Two days later, on April 23, 2012, in S.Q.'s presence, C.H.'s

parents confronted C.H. about what had transpired at the party.

C.H. cried and told them that defendant was kissing her, but did

not tell them about the other incidents because she was afraid

that her parents would be angry with her. When C.H. explained

that she was not the initiator, that defendant had been "chasing

after her[,]" and that it had been going on for some time, C.H.'s

parents asked if she wanted to go to the police and she agreed.

Later that day, accompanied by her parents, C.H. gave a signed

written statement to Detective Otlowski disclosing everything that

had occurred between her and defendant. Although Detective

 5 A-1598-14T1
Otlowski examined C.H.'s cell phone for any of the photographs

referenced in her statement, there were no photos on her phone.

C.H. also refused Detective Otlowski's offer to go to the hospital,

stating that she was not injured.

 After C.H. reported the incidents to the police, her

relationship with her sister changed for the worst and it made

C.H. "sad." Her sister believed defendant, who had told her that

C.H. was the one who was "offering herself to him." As a result,

on June 21, 2012, C.H. and her parents went to defense counsel's

office and signed waivers of prosecution. Although C.H. and her

parents were asked to sign a document admitting that the

allegations were false, they refused and instead signed a document

they believed meant that they "didn't want to go to court" and

they wanted "to drop the charges." C.H. testified that she signed

the document because she felt badly about "what [she was] doing

to [her] sister" and "want[ed] [defendant and her sister] to be

together" with their newborn baby.

 However, on July 27, 2012, C.H. testified before the grand

jury consistent with her signed statement to Detective Otlowski.

When her sister later contacted her and asked her to write a letter

recanting her allegations, C.H. agreed. On December 13, 2013,

accompanied by her sister, C.H. again went to defense counsel's

office and wrote exactly what her sister told her to write in a

 6 A-1598-14T1
signed statement recanting the allegations. Her sister told her

not to tell her parents about the recantation statement in case

they tried to stop her. In the statement, C.H. wrote: "I, [C.H.],

want to be clear that my testimony against [defendant] [was] false.

I am sorry for the time wasted in this case. I do not want to say

my reasons but I lied and I wish to say no more." After submitting

the statement, defense counsel and an investigator interviewed

C.H.; she reiterated to them that defendant did not touch her

inappropriately.

 Before testifying at the trial, C.H. met with members of the

Prosecutor's Office on March 21, April 21, and April 23, 2014. At

the trial, C.H. testified consistent with her statement to

Detective Otlowski and her grand jury testimony, but admitted that

she did not want to testify because of her sister and her sister's

child. When confronted with her waiver of prosecution and

recantation statement, C.H. explained that she felt she had to

recant her account for her sister because she "owed her." C.H.'s

statement to Detective Otlowski, her grand jury testimony, the

waiver of prosecution, and her recantation statement were all

admitted into evidence at the trial.

 After the State rested, defendant moved for a judgment of

acquittal pursuant to Rule 3:18-1, which was denied. Following

the jury verdict, defendant moved for a judgment notwithstanding

 7 A-1598-14T1
the verdict (JNOV) or a new trial, both of which were denied on

July 11, 2014. On September 26, 2014, defendant was sentenced 3

and this appeal followed.

 II.

 In Point I of his merits brief, defendant argues that it was

reversible error for the trial court to admit the victim's signed

statement to Detective Otlowski and her grand jury testimony. We

disagree.

 "[I]n reviewing a trial court's evidential ruling, an

appellate court is limited to examining the decision for abuse of

discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015)

(citation omitted). Under that standard, "[c]onsiderable latitude

is afforded a trial court in determining whether to admit

evidence," and "an appellate court should not substitute its own

judgment for that of the trial court, unless the trial court's

ruling was so wide of the mark that a manifest denial of justice

resulted." Id. at 385-86 (citations omitted).

 Here, defense counsel objected to the admission of the

evidence and argued that the probative value was substantially

outweighed by the risk of undue prejudice. The court overruled

3
 At the sentencing hearing, defendant pled guilty to violating
his probation on an unrelated charge. The trial court terminated
his probation without improvement. Defendant does not appeal the
termination.

 8 A-1598-14T1
defense counsel's objection and admitted C.H.'s signed statement

to Detective Otlowski and her grand jury testimony to rebut the

accusation of recent fabrication. Relying on State v. Johnson,

235 N.J. Super. 547, 555 (App. Div.), certif. denied, 118 N.J. 214

(1989), the court determined that the signed statement and the

grand jury testimony both met the requirements of N.J.R.E.

803(a)(2). The court also found that "the probative value

outweigh[ed] whatever prejudice there might be."

 N.J.R.E. 803(a)(2) provides:

 A statement previously made by a person who
 is a witness at a trial or hearing [is not
 excluded by the hearsay rule], provided it
 would have been admissible if made by the
 declarant while testifying and the statement
 . . . is consistent with the witness'
 testimony and is offered to rebut an express
 or implied charge against the witness of
 recent fabrication or improper influence or
 motive[.]

 "A 'charge' of recent fabrication can be effected through

implication by the cross-examiner as well as by direct accusation

of the witness. In fact[,] that is the usual way in which the

charge is made." Johnson, supra, 235 N.J. Super. at 555 (citation

omitted).

 [I]t is the impression the cross-examiner
 makes upon the jury in the heat of the trial
 rather than what an appellate court would
 discern from a coldly analytical study of the
 testimony which must control review of the

 9 A-1598-14T1
 somewhat discretionary exercise of judgment
 made by the trial judge in the matter.

 [Id. at 555-56 (quoting State v. King, 115
 N.J. Super. 140, 146-47 (App. Div.), certif.
 denied, 59 N.J. 268 (1971)).]

 Defendant acknowledges that defense counsel "sought to

impeach C.H.'s credibility during cross-examination when [C.H.]

was confronted with her written recantation made at [defense]

counsel's office." Nonetheless, defendant argues that "since

C.H.'s direct testimony was consistent with her statement given

to Detective Otlowski and with her grand jury testimony, there was

no express or implied charge of a recent fabrication to trigger

admission of her statement and grand jury testimony into evidence

as prior consistent statements." Defendant asserts that the

court's ruling was therefore erroneous because "a prior consistent

statement may not be offered solely to support a witness'

credibility."

 "An attack on a party's credibility through prior

inconsistent statements does not necessarily give [the party] the

right to use a prior consistent statement to buttress the party's

credibility." Palmisano v. Pear, 306 N.J. Super. 395, 403 (App.

Div. 1997). Here, however, defense counsel admittedly sought to

impeach C.H.'s credibility during cross-examination with her

recantation statement to imply that C.H.'s recantation was

 10 A-1598-14T1
accurate and that she recently fabricated a different version of

events when testifying, or in preparation for testifying, at trial.

See Johnson, supra, 235 N.J. Super. at 555 (admitting a witness's

prior statement after "defense counsel highlighted several

inconsistencies in details between the prior statement and [the

witness's] trial testimony, thus creating the inference that [he]

had not been truthful at trial").

 Such fabrication during trial or in preparation for trial is

certainly "recent" in common parlance. See King, supra, 115 N.J.

Super. at 146 (admitting a witness's statement to police and grand

jury testimony where defense counsel alluded to the witness's

threat a week before trial that she would lie at the trial).

Moreover, here, C.H.'s prior consistent statement to police and

grand jury testimony occurred prior to trial, and prior to trial

preparation. "Where the prior consistent statement was made before

the motive to fabricate arose, the fabrication is 'recent' enough

under N.J.R.E. 803(a)(2)." State v. Moorer, 448 N.J. Super. 94,

110 (App. Div. 2016).

 "The scope of the exception encompasses prior consistent

statements made by the witness before the alleged 'improper

influence or motive' to demonstrate that the witness did not change

his or her story." Neno v. Clinton, 167 N.J. 573, 580 (2001).

Thus, in Moorer, supra, we held that "fabrication is 'recent' if

 11 A-1598-14T1
it post-dates a prior consistent statement." 448 N.J. Super. at

110.

 In that situation, the prior consistent
 statement has clear probative value:

 Impeachment by charging that the testimony is
 a recent fabrication or results from an
 improper influence or motive is, as a general
 matter, capable of direct and forceful
 refutation through introduction of out-of-
 court consistent statements that predate the
 alleged fabrication, influence, or motive. A
 consistent statement that predates the motive
 is a square rebuttal of the charge that the
 testimony was contrived as a consequence of
 that motive.

 [Id. at 111 (quoting Tome v. U.S., 513 U.S.
 150, 158, 115 S. Ct. 696, 701, 130 L. Ed. 2d
 574, 582-83 (1995)).]

 Accordingly, it was not an abuse of discretion to admit C.H.'s

consistent statement to police and grand jury testimony to help

refute the allegation of recent fabrication. Moreover, our Supreme

Court has declined to adopt as a rigid admissibility requirement

that the previous statement was made prior to the motive or

influence to lie. State v. Chew, 150 N.J. 30, 81 (1997), cert.

denied sub nom., Chew v. New Jersey, 528 U.S. 1052, 120 S. Ct.

593, 145 L. Ed. 2d 493 (1999). Recognizing that "many things were

happening as the different stories unfolded[,]" and that "[t]here

were shades of difference between the witnesses' motivations at

different times[,]" the Court upheld the admission of consistent

 12 A-1598-14T1
statements made after some motive to fabricate arose, but before

other motives to fabricate arose. Id. at 80.

 Likewise, in State v. Muhammad, 359 N.J. Super. 361, 388-89

(App. Div.), certif. denied, 178 N.J. 36 (2003), we determined

that a witness' prior consistent statement was properly admitted,

reasoning:

 As in Chew much was happening at the various
 times [the witness] made statements and
 testified, and his motivations likely differed
 at different times. The defense used the
 taped statement to impeach [the witness] by
 pointing out inconsistencies with his prior
 statements and his trial testimony. The
 statement was not irrelevant to rebut the
 charge that [the witness'] testimony was the
 product of an improper influence or motive to
 lie. As in Chew, it related to differing
 motives to fabricate and was used for
 rehabilitative purposes.

 [Id. at 389 (citation omitted).]

 Here too, much was happening at the various times C.H. made

statements and testified and her motivation fluctuated at

different times. Her prior consistent statements were therefore

relevant to also rebut the charge that her testimony was the

product of an improper influence or motive to lie and was properly

admitted for rehabilitative purposes. Further, the "probative

value" of the evidence was not "substantially outweighed by the

risk of . . . undue prejudice" to mandate exclusion. N.J.R.E.

403. "[A] trial court's weighing of probative value against

 13 A-1598-14T1
prejudicial effect 'must stand unless it can be shown that the

trial court palpably abused its discretion, that is, that its

finding was so wide of the mark that a manifest denial of justice

resulted.'" State v. Cole, ____ N.J. ____, ____ (2017), slip op.

at 28 (quoting State v. Carter, 91 N.J. 86, 106 (1982)). We

discern no abuse of discretion in the court's weighing of the

probative value against the prejudicial effect and admitting

C.H.'s statement to Detective Otlowski and grand jury testimony.

 III.

 In Point II, defendant argues that the court erred in denying

his motion for the disclosure of the victim's medical,

psychological, school and records from the Division of Child

Protection and Permanency (DCPP) because "C.H.'s credibility was

a critical issue" and "there existed an inference that C.H. had

made a prior similar accusation against her father." Pre-trial,

defendant moved for disclosure of the records. To establish the

basis for the request, defendant relied on the following portion

of a recorded jailhouse phone conversation between defendant and

S.Q. referenced in a certification submitted by defense counsel:

 [DEFENDANT]: Baby, do you remember that
 . . . I said I was not going to say anything
 about what he did . . .

 [S.Q.]: Uh hum.

 [DEFENDANT]: Your father with your sister?

 14 A-1598-14T1
 [S.Q.]: Uh hum.

 [DEFENDANT]: I'm not going to say anything.
 Ok?

 [S.Q.]: Ok! Ok baby.

 [DEFENDANT]: Because it's your father and I
 don’t want anything to happen to him, but on
 the same token, I don’t want to be here.

In denying the motion, the court explained:

 This is not the situation in which
 there's a statement by the victim herself that
 anything happened untoward between the victim
 and her father. . . . This is the defendant
 saying that. And so, there's absolutely no
 factual basis that's been provided . . . that
 any of these records exist for any reason,
 anything related to the allegations in this
 case. . . .

 [M]edical records are covered by a
 statutory privilege . . . . The same is true
 by statute and . . . evidential rules for the
 psychological privilege. The school records
 are covered by statute, as are the . . . DCPP
 records.

 [U]nless there's a compelling need shown
 there's not even an in camera review. There's
 no indication that the victim ever reported
 any of this to a school official that would
 give rise to a search for anything in the
 school record. There's no indication in any
 of the discovery that the . . . victim, as a
 result of these incidents, has sought or is
 seeking, or has sought at any time,
 psychological treatment.

 . . . .

 15 A-1598-14T1
 And more importantly, when it comes to
 the medical, . . . the victim refused medical
 treatment so, there are no records.

 So, it is not appropriate to have the
 attorney file a statement saying that the
 victim said that something happened between
 the victim and her father, and therefore, it
 must be false. It was the defendant who was
 saying that, not the victim, nor anyone else.
 The defendant said that, it's clearly shown
 on tape.

 It's not the basis to engage in a
 wholesale fishing expedition for records which
 apparently, on their face, do not exist.

 "Appellate review of a trial court's discovery order is

governed by the abuse of discretion standard." State in Interest

of A.B., 219 N.J. 542, 554 (2014) (citation omitted). "Thus, an

appellate court should generally defer to a trial court's

resolution of a discovery matter, provided its determination is

not so wide of the mark or is not 'based on a mistaken understanding

of the applicable law.'" Ibid. (quoting Pomerantz Paper Corp. v.

New Cmty. Corp., 207 N.J. 344, 371 (2011)). However, "[i]n

construing the meaning of a statute, court rule, or case law, 'our

review is de novo,'" and we owe no deference to the trial court's

legal conclusions. Id. at 554-55.

 "[T]he Confrontation Clause does not require the disclosure

of any and all information that might be useful to a defendant."

State v. Van Dyke, 361 N.J. Super. 403, 412 (App. Div.), certif.

 16 A-1598-14T1
denied, 178 N.J. 35 (2003). Information that is confidential or

subject to a privilege requires courts to balance the defendant's

right to confrontation against an individual's right to privacy.

Although the standards for piercing various privileges and

overcoming confidentiality are worded differently, they share the

requirement that the applicant "must advance 'some factual

predicate which would make it reasonably likely that the file will

bear such fruit and that the quest for its contents is not merely

a desperate grasping at a straw.'" State v. Harris, 316 N.J.

Super. 384, 398 (App. Div. 1998) (citation omitted). See also

Kinsella v. Kinsella, 150 N.J. 276, 306-07 (1997) (holding that

courts should not order disclosure of psychological records even

for an in camera review absent showing of a legitimate need for

the evidence, relevance and materiality to the issue before the

court, and unavailability of the information from any less

intrusive source); Kinsella v. NYT Television, 382 N.J. Super.

102, 111 (App. Div. 2005) (holding disclosure of privileged medical

records required only upon "'compelling' showing of a

particularized need for the information"); State v. Krivacska, 341

N.J. Super. 1, 35 (App. Div.), certif. denied, 170 N.J. 206 (2001),

cert. denied, 535 U.S. 1012, 122 S.Ct. 1594, 152 L. Ed. 2d 510

(2002) (finding that relevant school records should only be

disclosed to a defendant upon a showing of particularized need);

 17 A-1598-14T1
N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593,

637 (App. Div.), certif. denied, 204 N.J. 38 (2010) (holding

release of DCPP records may be made only upon demonstration that

disclosure is necessary for determination of an issue before the

court).

 Here, we are satisfied that the court correctly determined

that defendant failed to provide the required factual predicate

or showing of a particularized need to justify disclosure of the

records even for an in camera review. Indeed, given defendant's

inability to show that such records even existed, his factual

predicate was no more than "a desperate grasping at a straw." Van

Dyke, supra, 361 N.J. Super. at 412 (quoting Harris, supra, 316

N.J. Super. at 398).

 IV.

 In Point III, defendant argues that the court erred in denying

his motion for JNOV or a new trial because "the inconsistency in

the jury's guilty verdict constitutes a manifest injustice under

the law" and "represents [the jury's] failure to rationally apply

the reasonable doubt standard[.]" Defendant also asserts that a

"flawed jury instruction . . . could have erroneously led the jury

to find defendant guilty." Specifically, defendant asserts that

the jury charge "erroneously instructed the jury that defendant

is guilty of endangering the welfare of a minor if he knew that

 18 A-1598-14T1
his conduct could impair or [debauch] the morals of C.H." We

reject defendant's contentions.

 In a post-trial motion, defendant moved for JNOV or a new

trial. The judge denied the motion, explaining that:

 [A] new trial is not the proper remedy because
 there is no clear and convincing evidence that
 the verdict was the result of mistake,
 partiality, prejudice, or passion. There was
 no obvious juror error here. Based on the
 evidence and testimony, the jury could
 reasonably find defendant guilty beyond a
 reasonable doubt for the crime of endangering
 the welfare of a child. There was evidence
 that [C.H.] was a child of 14 years old when
 this incident occurred; that defendant engaged
 in sexual conduct by exchanging text messages
 and Facebook messages with [C.H.], including
 messages asking her to send naked pictures of
 herself, after sending her naked pictures of
 himself, as well as telling [C.H.] repeatedly
 he wanted to "[f**k] her;" and that defendant
 knew this conduct would impair or debauch the
 morals of [C.H.]. Defendant's conduct of
 repeatedly sending and receiving sexual
 messages, including naked picture messages and
 suggesting that she participate in sexual
 intercourse with him constitutes sexual
 conduct.

 The court also rejected defendant's argument that the

inconsistent verdicts justified granting a new trial, noting that

"legally it is of no consequence that the jury acquitted the

defendant of crimes which may have been in part an element of the

crime for which the defendant was convicted." The court also

determined that the single "typographical error" in the written

 19 A-1598-14T1
jury charge did not mandate overturning the guilty verdict or

granting defendant a new trial.

 The standard to be applied by a trial judge in deciding a

motion for an acquittal under Rule 3:18-2 after the jury has been

discharged is the same as that which applies when a motion for

acquittal is made before the case is submitted to the jury under

Rule 3:18-1.

 On a motion for judgment of acquittal, the
 governing test is: whether the evidence viewed
 in its entirety, and giving the State the
 benefit of all of its favorable testimony and
 all of the favorable inferences which can
 reasonably be drawn therefrom, is such that a
 jury could properly find beyond a reasonable
 doubt that the defendant was guilty of the
 crime charged.

 [State v. D.A., 191 N.J. 158, 163 (2007)
 (citing State v. Reyes, 50 N.J. 454, 458-59
 (1967)).]

 We have stated that "the trial judge is not concerned with

the worth, nature[,] or extent (beyond a scintilla) of the

evidence, but only with its existence, viewed most favorably to

the State." State v. DeRoxtro, 327 N.J. Super. 212, 224 (App.

Div. 2000) (citation omitted). Our review of a trial court's

denial of a motion for acquittal is "limited and deferential[,]"

and is governed by the same standard as the trial court. State

v. Reddish, 181 N.J. 553, 620 (2004).

 20 A-1598-14T1
 In considering whether a guilty verdict was against the weight

of the evidence produced at trial under Rule 3:20-1, "our task is

to decide whether 'it clearly appears that there was a miscarriage

of justice under the law.'" State v. Smith, 262 N.J. Super. 487,

512 (App. Div.), certif. denied, 134 N.J. 476 (1993) (quoting R.

2:10-1). "We must sift through the evidence 'to determine whether

any trier of fact could rationally have found beyond a reasonable

doubt that the essential elements of the crime were present.'"

Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)). Our

"objective is not to second-guess the jury but to correct [an]

injustice that would result from an obvious jury error." State

v. Saunders, 302 N.J. Super. 509, 524 (App. Div.), certif. denied,

151 N.J. 470 (1997). We do not evaluate the evidence and determine

anew how we might have decided the issues.

 Applying these standards, we conclude that the State

presented sufficient proofs to establish beyond a reasonable doubt

that defendant was guilty of third-degree endangering the welfare

of a child. Pursuant to N.J.S.A. 2C:24-4(a)(1), "[a]ny person

. . . who engages in sexual conduct which would impair or debauch

the morals of [a] child is guilty of a crime[.]" While the term

"sexual conduct" is not defined in N.J.S.A. 2C:24-4, it is well-

recognized that the statute does not require direct sexual contact.

See State v. Hackett, 323 N.J. Super. 460, 472 (App. Div. 1999)

 21 A-1598-14T1
(holding that "'sexual conduct' includes showing nude explicit

photographs to children"), aff'd as modified, 166 N.J. 66 (2001).

Based on the totality of the circumstances, mere sexual

conversations or encouragement of sexual conduct may be sufficient

for a jury's finding of "sexual conduct." See State v. McInerney,

428 N.J. Super. 432, 438, 450 (App. Div. 2012), certif. denied,

214 N.J. 175 (2013) (holding that defendant's encouragement of

sexual conduct was sufficient to satisfy the element); see also

State v. Maxwell, 361 N.J. Super. 502, 517-18 (Law Div. 2001)

(recognizing that "sexually explicit conversation" may "rise[] to

the level of 'sexual conduct'"), aff'd o.b., 361 N.J. Super. 401

(App. Div.), certif. denied, 178 N.J. 34 (2003).

 Based on the circumstances of the present case, we agree with

the judge that defendant's conduct towards C.H. constituted

"sexual conduct" as contemplated by the child-endangerment statute

and was sufficient to support a conviction. Giving the State the

benefit of all favorable inferences from the testimony it

presented, we are satisfied that the verdict was not a miscarriage

of justice, was supported by sufficient credible evidence in the

record, and the judge properly denied defendant's motion for a

judgment of acquittal or for a new trial.

 This brings us to defendant's argument regarding inconsistent

verdicts. Assuming, for purposes of our analysis, that there was

 22 A-1598-14T1
an inconsistency between the verdicts, inconsistent verdicts are

permissible, and "[w]e do not speculate why a jury acquits." State

v. Banko, 182 N.J. 44, 54 (2004). An inconsistent verdict may be

the product of jury nullification, mistake, compromise, or lenity,

and so, is not questioned. Id. at 54-55. Such verdicts will be

upheld so long as there is sufficient evidence to support the

convictions beyond a reasonable doubt. Ibid. We note, however,

that while we need not resolve or explain away inconsistencies in

a verdict, we find no inconsistency in this verdict. Because the

different counts corresponded to different conduct, it is highly

likely that the verdict reflected the jury's acceptance of C.H.'s

testimony about the sexual conduct generally but not the specific

instance of sexual contact or digital penetration. Accordingly,

there is no basis to disturb the verdict based upon any perceived

inconsistency in the verdicts.

 We also reject defendant's argument that an error in the jury

instruction led to the guilty verdict. Because clear and correct

jury charges are essential to a fair trial, State v. Adams, 194

N.J. 186, 207 (2008), "erroneous instructions on material points

are presumed to possess the capacity to unfairly prejudice the

defendant." State v. McKinney, 223 N.J. 475, 495 (2015) (citations

omitted). However, an error in the charge that could not have

affected the jury's deliberations does not amount to reversible

 23 A-1598-14T1
error. State v. Docaj, 407 N.J. Super. 352, 366 (App. Div.),

certif. denied, 213 N.J. 568 (2013). In that regard, "[i]f the

defendant does not object to the charge at the time it is given,

there is a presumption that the charge was not error and was

unlikely to prejudice the defendant's case." State v. Singleton,

211 N.J. 157, 182 (2012).

 Here, defendant did not object to the charge. Because

defendant did not object at trial, we review the charge for plain

error. R. 1:7-2; R. 2:10-2; McKinney, supra, 223 N.J. at 494.

Plain error in this context is "[l]egal impropriety in the charge

prejudicially affecting the substantial rights of the defendant

sufficiently grievous to justify notice by the reviewing court and

to convince the court that of itself the error possessed a clear

capacity to bring about an unjust result." Adams, supra, 194 N.J.

at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997))

(alteration in original). When reviewing a charge for plain error,

an appellate court must not examine the "portions of the charge

alleged to be erroneous in isolation; rather, 'the charge should

be examined as a whole to determine its overall effect[.]'"

McKinney, supra, 223 N.J. at 494 (quoting Jordan, supra, 147 N.J.

at 422).

 Here, in the written instructions given to the jury, on four

occasions, the word "would" is used in referring to the "sexual

 24 A-1598-14T1
conduct which would impair or debauch" element of the child-

endangerment charge (emphasis added). However, on one occasion,

the word "could" mistakenly appears instead of "would." The jury

asked no questions that would suggest that it was confused or

misled by the error. "This was, then, an error that was isolated

rather than pervasive in the charge." Docaj, supra, 407 N.J.

Super. at 364.

 As we stated in Docaj, where the trial court mistakenly used

the wrong word once out of four times in its jury charge on

passion/provocation manslaughter, the error "was but one iteration

imbedded in a charge that contained three entirely correct

articulations of the State's burden regarding the third factor[,]"

and the "isolated error's capacity to dispel" the effect of the

correct portions of the charge "was minimal, at best." Id. at

365. As in Docaj, here, the

 error was one word that was literally buried
 in a charge that was otherwise correct. The
 error went unnoticed by the "experienced
 jurists and lawyers" who "reviewed and
 refined" the charge . . . as well as the trial
 court and counsel here. We conclude that the
 failure to object here reflected the obscure
 nature of the error and that it is more likely
 that the jury also depended upon the overall,
 correct expressions of the controlling legal
 principles rather than the one erroneous
 statement here.

 [Id. at 370 (citation omitted).]

 25 A-1598-14T1
 We note further that in the oral instructions given to the

jury, the court used "would" correctly on seven different

occasions. Therefore, when reading the charge as a whole, it

cannot be said that the typographical error in the written charge

was so misleading, confusing, or ambiguous that it was clearly

capable of producing an unjust result or that it led the jury to

a verdict that it otherwise might not have reached.

 V.

 Finally, in Point IV, defendant challenges his sentence as

excessive and unwarranted given "the crime for which the defendant

was found guilty, and the aggravating factors present[.]"

Defendant argues that in imposing "the maximum authorized

custodial base sentence[,]" the court fell short in its

"deliberative process" because "it did not acknowledge that it

began its aggravating/mitigating factor analysis at the three (3)

year minimum sentencing range for a crime of the third degree."

We disagree.

 Trial judges have broad sentencing discretion. State v.

Dalziel, 182 N.J. 494, 500 (2005). Judges must identify and

consider "any relevant aggravating and mitigating factors" that

"are called to the court's attention[,]" and "explain how they

arrived at a particular sentence." State v. Case, 220 N.J. 49,

64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297 (2010);

 26 A-1598-14T1
State v. Fuentes, 217 N.J. 57, 74 (2014)). "Appellate review of

sentencing is deferential," and we therefore avoid substituting

our judgment for the judgment of the trial court. Case, supra,

220 N.J. at 65; see State v. O'Donnell, 117 N.J. 210, 215 (1989);

State v. Roth, 95 N.J. 334, 365 (1984). We will thus "affirm a

sentence under review unless: (1) the sentencing guidelines were

violated; (2) the findings of aggravating and mitigating factors

were not [supported by] competent credible evidence in the record;

or (3) the application of the guidelines to the facts of the case

shock[s] the judicial conscience." State v. Bolvito, 217 N.J.

221, 228 (2014) (citation omitted).

 Here, the judge determined that aggravating factors three

(risk of re-offense), six (defendant's prior criminal record), and

nine (need for deterrence) applied, N.J.S.A. 2C:44-1(a)(3),

-1(a)(6), -1(a)(9), and that the aggravating factors substantially

outweighed the non-existent mitigating factors. The judge

explained that defendant's prior criminal history, which included

a prior conviction for criminal sexual contact involving the

victim's sister, supported the court's findings. We are satisfied

that the judge made findings of fact that were based on competent

and reasonably credible evidence in the record and applied the

correct sentencing guidelines enunciated in the Code. Further,

the sentence does not shock our judicial conscience. Case, supra,

 27 A-1598-14T1
220 N.J. at 65; O'Donnell, supra, 117 N.J. at 215-16. Contrary

to defendant's assertion, the court was not required to begin its

deliberative process from the bottom of the sentencing range, but

rather from the middle "as a logical starting point" with

sentencing "toward the higher end of the range" if, as here, "the

aggravating factors preponderate[.]" State v. Natale, 184 N.J.

458, 488 (2005). Accordingly, we discern no basis to second-guess

the judge.4

 Affirmed.

4
 While this appeal was pending, over defendant's objection, the
State moved before the trial court to amend the judgment of
conviction pursuant to Rule 3:21-10(d) to require defendant's
compliance with the provisions of Megan's Law, N.J.S.A. 2C:7-1 to
-23. Rule 3:21-10(d) expressly excepts applications for
sentencing relief pending appeal from the general jurisdictional
bar of Rule 2:9-1(a) upon notice to the Appellate Division. After
we were duly notified, the motion was granted and the judgment of
conviction was amended accordingly.

 28 A-1598-14T1